## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CALIFORNIA TABLE GRAPE COMMISSION<br>392 West Fallbrook Avenue, Suite 101<br>Fresno, CA  93711,<br><br>NATIONAL GRAPE RESEARCH ALLIANCE<br>P.O. Box 161707<br>Sacramento, CA  95816,<br><br>and<br><br>CALIFORNIA TABLE GRAPE EXPORT ASSOCIATION<br>392 West Fallbrook Avenue<br>Fresno, CA  93711,<br><br><br>*Plaintiffs*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF AGRICULTURE;<br>THOMAS J. VILSACK, in his official capacity as Secretary,<br>United States Department of Agriculture; and MICHAEL<br>WATSON, in his official capacity as Administrator, Animal<br>and Plant Health Inspection Service,<br><br>*Defendants*. | Civil Action No. 1:24-cv-02645 |

## **COMPLAINT**

Plaintiffs California Table Grape Commission (CTGC or the Commission), the National

Grape Research Alliance (NGRA or the Alliance), and the California Table Grape Export

Association (CTGEA or the Association) bring this complaint to challenge the recent approval

by the U.S. Department of Agriculture (USDA or the Department) of a new "systems approach"

for importing grapes from Chile that unlawfully abandons traditional, time-tested safeguards and

that will expose U.S. grape producers to substantial risks and costs, including those related to invasive pests.  Plaintiffs hereby allege the following:

## INTRODUCTION

1.    U.S. farmers strive to keep their crops clear of insects, plant diseases, and other pests that can wreak havoc on the agricultural sector and related industries, threaten the security of the U.S. food supply, reduce the quality and production value of agricultural outputs, and cause other countries to restrict U.S. producers' access to foreign markets.  U.S. producers thus have a critical interest in ensuring that imports from other countries do not introduce new pests into the United States.  Imported grapes, for example, can serve as hosts to pests that destroy or degrade crops.

2.    The effect of introducing a new pest into the United States can be devastating.  As just one example, after an outbreak of the European grapevine moth (*Lobesia botrana* or EGVM) occurred in California in 2009, eradication efforts dragged on for seven years and cost stakeholders and taxpayers over $100 million in eradication costs—even before counting the economic harm to growers.[1]

3.    To protect domestic agriculture, the environment, and the economy against such risks, Congress has established a regime tasking the USDA with preventing the "introduction into the United States or the dissemination of a plant pest … within the United States."[2]  To that end, countries hoping to export their agricultural products to the United States must follow the requirements set by the USDA division called the Animal and Plant Health Inspection Service (APHIS).  APHIS carries out its mission by regulating the treatments and systems used to

---

[1] Weston Williams, *How California Eradicated an Invasive Grapevine Moth*, Christian Science Monitor (Aug. 21, 2016), https://tinyurl.com/49ajc7s9.

[2] 7 U.S.C. § 7712(a).

mitigate pest risks from each country seeking U.S. market access before agricultural products can be distributed domestically.  Underscoring the importance of the decisions APHIS makes, Congress required that the process by which APHIS makes decisions about whether to impose or lift treatment requirements be both "transparent and accessible" and "based on sound science."[3]

4.     To fulfill its statutory mandate and to protect domestic grapes from pests and disease, for most of the last six decades, the USDA and APHIS have required that grapes imported from Chile be fumigated before distribution in the United States.  This history reflects the acknowledged fact that Chile is home to a number of pests that would threaten U.S. agricultural production if they became widespread in the United States.  APHIS has, in fact, recently identified eleven pest species in Chile that would cause harm to grapes in the United States.  For the European grapevine moth alone (*Lobesia botrana*), Chile reported capturing 74,354 moths by the end of the first flight during the 2018-2019 Chilean grape season.[4]  Beyond the European grapevine moth, other harmful pest species established in Chile that warrant caution include the Chilean false red mite (*Brevipalpus chilensis*), the Chilean fruit tree leaf folder (*Proeulia auraria*), the Brazilian apple leafroller (*Bonagota salubricola*), the Mexican Dcabbage heartworm (*Copitarsia decolora*), and another type of moth (*Accuminulia buscki*).[5]

---

[3] 7 U.S.C. § 7712(b).

[4] Ex. 1 (2022-APHIS-05238-F_000416).  Citations to 2022-APHIS-05238-F_###### refer to documents produced to the Commission's outside counsel in response to a request made under the Freedom of Information Act (FOIA) in August 2022, and which are attached as Exhibit 1 to this complaint.

[5] Importation of Grapes (*Vitis vinifera*) for Consumption from Chile into the United States: A Qualitative, Pathway Initiated Pest Risk Assessment, Doc. No. APHIS-2021-0078-0004 at 1 (May 2, 2022), https://www.regulations.gov/document/APHIS-2021-0078-0004 [hereinafter 2022 PRA].  The remaining pests are *Chileulia stalactitis*, *Proeulia chrysopteris*, *Proeulia triquetra*, *Pseudococcus cribata*, and *Pseudococcus meridionalis*.  *Id.*  Of those eleven pests, APHIS identified eight of them in 2009 as having a medium- or high-risk potential.  *See* Importation of Grapes, *Vitis vinifera*, from Chile into the United States:  A Pathway-Initiated

5.      To address the risks posed by pests, APHIS has long required fumigation of Chilean grapes.  Fumigation is a tried-and-true method of pest control:  it works broadly to curb risks associated with grape-related pests, and the specific fumigant mandated for years, methyl bromide, is particularly useful for grapes.  Fumigation with methyl bromide is highly effective at killing not just known pests of concern, but all pests, including emerging pests that have not yet been properly evaluated.  Fumigation of grapes is well supported by a vast body of scientific literature showing its effectiveness for eliminating pests.  This established approach to pest management has successfully protected the United States from Chilean pests and from the economic and environmental devastation they cause.

6.      Prior attempts to move away from fumigating grapes imported from Chile have reinforced the need for robust protection against the introduction of both known and new pests. In 1960, the USDA's Agricultural Research Service, under authority subsequently transferred to APHIS,[6] engaged in a rulemaking to announce mandatory methyl bromide fumigation for Chilean fruits, including grapes.[7]  The Agricultural Research Service explained that "[p]lant pest infestations" in Chilean fruits had "increased in recent years," including infestations of the Chilean false red mite and four other pests.  Because those fruits were so "intensely infested" that "inspection of representative lots" could not reliably reveal the pests, methyl bromide

---

Risk Assessment 60 (Oct. 27, 2009) [hereinafter 2009 PRA] (attached as Ex. 2).  At that time, APHIS also identified sixteen other pests with a medium risk potential.  *Id.*

[6] Nat'l Archives, *Records of the Animal Plant and Health Inspection Service*, https://www.archives.gov/research/guide-fed-records/groups/463.html (all websites last visited Sept. 13, 2024).

[7] 25 Fed. Reg. 10,861, 10,865 (Nov. 16, 1960).

fumigation "was necessary to protect the fruit-growing industry of the United States against introduction of these pests."[8]

7.    The USDA later experimented with relaxing this requirement, mandating fumigation only if pests were intercepted on shipments.[9]  But after 118 interceptions of the Chilean false red mite in 1994 and 1995, mandatory fumigation for table grapes—i.e., grapes for fresh consumption—was reinstated in 1996.  After additional interceptions of the Chilean false red mite and other pests in the early 2000s, APHIS again modified the fumigation requirements in 2006 to make them more robust.

8.    In 2008, after pressure from Chile, APHIS was poised to replace mandatory fumigation with a regime permitting a "systems approach" for table grapes from certain regions in Chile.  According to APHIS, a systems approach is "a set of phytosanitary conditions, at least two of which have an independent effect in mitigating the pest risk associated with the movement of commodities."[10]  Types of phytosanitary conditions that could, when combined, constitute a systems approach include, for example, testing fields to assess whether they have a low prevalence of pests, separating damaged fruit from intact fruit, and visually inspecting fruit for pests.[11]  Moving from fumigation to a systems approach thus trades a highly effective pest-prevention measure for several imperfect measures that are prone to human error.  And although

---

[8] *Id.* at 10,866.

[9] APHIS, Importation of Grapes From Chile Into the United States, 89 Fed. Reg. 58,703 (July 19, 2024) [hereinafter Grape Import Notice].

[10] APHIS, Importation of Grapes from Chile Under a Systems Approach, 73 Fed. Reg. 50,577, 50,578 (Aug. 27, 2008).  "Phytosanitary" means "relating to, or being measures for the control of plant diseases especially in agricultural crops."  *Phytosanitary*, Merriam-Webster, https://tinyurl.com/447z8zns.

[11] The umbrella term "systems approach" can also encompass systems that include postharvest treatments, but that is not the case for the systems approach at issue here, so Plaintiffs use the term to refer to an approach without fumigation or other postharvest treatments.

fumigation can effectively target multiple types of pests, both known and unknown, the systems approach requires measures specific to the targeted pests.

9.      The systems approach for Chilean table grapes that APHIS almost adopted in 2008 was specific to controlling the false red mite and did not include measures specific to counteracting other pests, such as the European grapevine moth.  Mere months after APHIS proposed a rule permitting a systems approach, there was an outbreak of the European grapevine moth in Chile.  Faced with the threat of an outbreak here in the United States, APHIS declined to adopt the systems approach for Chilean table grapes and continued mandatory methyl bromide fumigation.

10.     APHIS is well aware of the potential shortfalls of a systems approach in Chile. Four years ago, APHIS was considering a systems approach for Chilean plums.  The measures in the proposed systems approach did not account for the risk of the European grapevine moth because APHIS did not consider plums to be hosts for the moth.  In a pattern that should seem familiar, live EGVM larvae were detected in Chilean plums in January 2021, during a preclearance inspection prior to distribution in the United States.  APHIS scrambled to modify the approved systems approach and adopted one in January 2022 that supposedly controlled for the European grapevine moth.  Yet, in a preclearance inspection during February 2024, APHIS reported live larvae feeding inside systems-approach plums from Chile.  APHIS ultimately acknowledged that the systems approach had implementation failures, including the inclusion of certain areas within Chile that should not be eligible for a systems approach.  In response, APHIS increased preclearance sampling rates, reimposed methyl bromide fumigation for fruit

from the infested region in Chile, and requested that the U.S. Customs and Border Patrol increase plum inspections at the U.S. entry point.[12]

11.     Despite the well-documented effectiveness of mandatory fumigation, despite the cautionary tale posed by the ill-advised proposed systems approach for Chilean grapes in 2008, and despite the lessons of the systems approach failures for plums, APHIS has now eliminated the fumigation requirement for Chilean table grapes and embraced a systems approach.  APHIS's decision was evidently motivated by its desire to reduce the use of methyl bromide and adverse environmental consequences, but it did so without meaningfully evaluating other effective and environmentally friendly measures.[13]

12.     APHIS made this significant shift in the legal requirements governing the import of Chilean table grapes through an agency-created "notice" procedure that, in purpose and effect, sidesteps critical APHIS rulemaking obligations.  Although there are undoubtedly other options for mitigating pest risk, APHIS has admittedly focused exclusively on the systems approach proposed by Chile.  For example, the Grape Import Notice explained that APHIS confined its analysis to the request from the national plant protection organization of Chile, which "did not ask [APHIS] to evaluate other fumigation methods, nor include information regarding other

---

[12] Indeed, Chile itself recognizes the effectiveness of methyl bromide fumigation.  Chile recently announced a methyl bromide fumigation requirement on U.S. table grapes exported to Chile in response to the USDA's prior removal of domestic quarantine pest orders for the light brown apple moth (*Epiphyas postvittana*).  Chile has delayed implementation of the policy until December 1, 2024.

[13] Methyl bromide is known to contribute to the depletion of the Earth's ozone layer, and APHIS has made it a priority to phase out methyl bromide for that reason.  April Dawson, *Plant Protection Today:  APHIS' Recent Successes in Reducing Methyl Bromide Use*, APHIS, https://www.aphis.usda.gov/news/program-updates/reducing-methyl-bromide-use ("Finding alternatives to the fumigant methyl bromide is an acute need for USDA's [APHIS]."); *see also Methyl Bromide*, EPA, https://www.epa.gov/ods-phaseout/methyl-bromide ("[T]he United States has phased out production and consumption of methyl bromide with important exceptions for critical uses as well as quarantine and preshipment.").

fumigation methods, and it would have therefore been inconsistent with [APHIS's] regulatory process to do so."[14]  In other words, APHIS has functionally allowed Chile's petition—which essentially asks APHIS to give a yes-or-no response to its request that growers from certain regions in Chile be allowed to employ the systems approach—to define and limit the scope of its review and to preclude it from considering alternatives.

13.    Despite taking effect on July 19, 2024, the planned implementation of the newly adopted systems approach for Chilean table grapes cannot yet be fully understood, as APHIS has worked with Chile's national plant protection organization behind closed doors to hammer out the details, and APHIS refuses to share the text of the operational workplan (OWP) with the public or to allow the public to comment on how the workplan should be structured.

14.    In adopting a systems approach, APHIS effectively shifts risks and costs from the Chilean industry onto the U.S. industry.  After the devastating effects of the 2009 outbreak of the European grapevine moth in California,[15] a wide range of stakeholders mobilized to protect U.S. grapes, including "growers, County Agricultural Commissioners, University of California Cooperative Extension, [and] the California Department of Food and Agriculture."[16]  California grape growers were ultimately responsible for half of the $100 million spent on the eradication effort.[17]  Then-Deputy Administrator for APHIS Osama El-Lissy stated in 2015 that this outbreak threatened U.S. crops worth $5.7 billion, which not only imperiled the $14 billion

---

[14] Grape Import Notice at 58,705.

[15] *Supra* ¶ 2.

[16] APHIS, European Grapevine Moth Post-Eradication Response Guidelines 1 (June 2016), https://www.aphis.usda.gov/sites/default/files/post-eradication-guidelines.pdf.

[17] *See* Paul Franson, *Napa Moth Eradication Cost Near $90 Million*, Wine Bus. Analytics (Aug. 13, 2014), https://tinyurl.com/y9kv8228 (explaining that remaining costs were covered by state and federal governments).

economy in one California county alone, but also "threatened to close valuable export markets for U.S. grapes and stonefruit around the world."[18]  The threatened industries also included the industries for wine, raisins, juice, vinegar, nursery stock, jams and jellies, and other products.

15.     A failure of the systems approach for Chilean table grapes would be equally catastrophic, if not more so.  The United States imports more table grapes from Chile than do China, the Netherlands, the United Kingdom, and South Korea combined.[19]  In California alone—which is home to essentially all commercial U.S. raisin production, 99% of commercial U.S. table grape production, and roughly 85% of U.S. wine grapes—nearly 10 million boxes of Chilean table grapes went through California ports during the 2022 season, and nearly 11 million boxes went through California ports during the 2023 season.  Each box that is eligible for a relaxed systems approach, instead of mandatory treatment using highly effective fumigation, presents an unacceptably high risk of letting foreign pests into California.  That risk is only compounded by the millions of boxes that go through Philadelphia and Camden (16 million in 2022 and 30 million in 2023) and Delaware (10 million in 2022 and 6.5 million in 2023), as well as the hundreds of thousands of boxes that make their way through Georgia, Florida, and Puerto Rico.  Grapes are commercially grown in every state in the country except Alaska, so weakening the import requirements for Chilean table grapes threatens farmers and industries nationwide.

16.     A change in import requirements for Chilean table grapes would have tremendous consequences.  For instance, if there is another outbreak of the European grapevine moth or a

---

[18] Osama El-Lissy, *From Over 100,000 to 1:  Partners Band Together to Beat the European Grapevine Moth*, USDA (Apr. 27, 2015), https://www.usda.gov/media/blog/2015/04/27/over-100000-1-partners-band-together-beat-european-grapevine-moth [hereinafter El-Lissy, *From Over 100,000 to 1*].

[19] Grape Import Notice at 58,711.  Those four countries have the next-largest Chilean table grape markets after the United States.  *Id.*

new pest, stakeholders and taxpayers would again be forced to incur substantial eradication costs, and these costs pale in comparison to the possible economic damage from quarantines or other restrictions that could be imposed on American exports as the result of an outbreak in the United States.

17.     Despite the proven effectiveness of the well-established status quo in combatting these grave risks, APHIS issued the Grape Import Notice in July 2024, upending longstanding protections and relaxing the mandatory fumigation requirement in favor of a systems approach. This significant weakening of import controls—carried out at the request of Chile's national plant protection organization without full rulemaking—defies APHIS's statutory duties to protect the United States from foreign pests and to base its import decisions on sound science, and was accomplished without processes ensuring the required transparency.

18.     The Grape Import Notice is unlawful under the Administrative Procedure Act (APA) in multiple respects. *First*, the substantive changes announced in the Grape Import Notice, which reverse decades-long requirements originally promulgated after notice and comment, are legislative rules that again required notice-and-comment rulemaking. APHIS proceeded, however, with an informal, agency-invented, notice-based process that circumvents critical rulemaking requirements. In particular, APHIS did not properly disclose the information, data, or studies it relied on in promulgating the new requirements, in contravention of its statutory duty to employ "transparent" and "accessible" processes.[20] Notably, APHIS refused— and still refuses—to solicit comment on, or even share the text of, a separate, binding operational workplan according to APA procedures, despite the workplan containing critical information on how Chilean producers will implement the systems approach and how APHIS and its Chilean

---

[20] 7 U.S.C. § 7712(b).

counterpart, Servicio Agrícola y Ganadero (SAG), will oversee compliance with the systems approach.  APHIS also refused to share the data underlying pilot studies, some of which are two decades old, that it relied on in concluding that there was "sufficient evidence that a systems approach that includes low prevalence of *B. chilensis* effectively removes this pest from the importation pathway."[21]  APHIS has thus deprived the public of a meaningful opportunity to comment by withholding key information.

19.      *Second*, even if APHIS were permitted to change its import requirements without complying with the APA's rulemaking requirements, the Grape Import Notice was not only arbitrary and capricious, but also untethered from "sound science."[22]  APHIS failed to engage in reasoned decisionmaking or adequately explain its changed approach.  APHIS did not address critical information and disclaimed the need to perform sound analyses.  APHIS's failures are evident throughout the Grape Import Notice and prior Federal Register publications.  APHIS failed, for example, to account reasonably for the risk of gamesmanship, new pests, and accidents, or to conduct adequate cost-benefit and economic analyses, among other defects in its process.  APHIS also disavowed a rigorous analysis by claiming in the final Grape Import Notice that it was limited to assessing the systems approach that Chile's national plant protection organization requested and thus was not obligated to consider alternative fumigation methods. Such tunnel vision is far from "sound science."[23]

---

[21] APHIS, Commodity Import Evaluation Document for the Importation of Table Grapes for Consumption from Chile into the United States, Doc. No. APHIS-2021-0078-0053, at 11 (June 28, 2024), https://www.regulations.gov/document/APHIS-2021-0078-0053 [hereinafter 2024 CIED].

[22] 7 U.S.C. § 7712(b).

[23] *Id.*

20.     For these reasons and the others discussed below, the Grape Import Notice creates grave, serious, and unacceptable risks for Plaintiffs as well as the United States more generally, placing Chilean interests above the domestic interests Congress wanted to protect.  This Court should vacate and set aside the Grape Import Notice and declare it to be arbitrary and capricious, contrary to law, and adopted without observance of procedure required by law.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331, 2201-2202, as well as the APA, 5 U.S.C. §§ 701-706.

22.     Venue is proper in this District under 28 U.S.C. § 1391(e) because Defendant Secretary Vilsack is an officer of the United States sued in his official capacity, and in that capacity, resides in this District.  Venue is also proper in this District because Defendant U.S. Department of Agriculture is an agency of the United States with headquarters in this District.

## PARTIES

23.     Plaintiff California Table Grape Commission is a public entity created by the State of California and tasked by the state's legislature with serving the "interests of the welfare, public economy and health of the people" of California by expanding demand for California table grapes worldwide.[24]  The California Legislature found that "[g]rapes produced in California for fresh human consumption comprise one of the major agricultural crops of California, and the production and marketing of such grapes affects the economy, welfare, standard of living and health of a large number of citizens residing in this state."[25]  The Commission's governing board is composed of up to eighteen members representing up to six table grape growing districts in

---

[24] Cal. Food & Agric. Code § 65500(f); *see also id*. § 65550.

[25] *Id.* § 65500(a).

California, along with one public member.  All members are appointed by the Secretary of the California Department of Food and Agriculture (CDFA).

24.    The Commission is authorized to conduct a wide range of activities to increase demand for California table grapes.  Those activities include sponsoring and overseeing scientific research relating to grapes and engaging in education and outreach about table grapes and the industry.[26]  The Commission's 2024 budget for agricultural research relating to table grapes is $1.55 million, and its budget for invasive species in particular is approximately $134,600.  By statute, the Commission also has the power to "present facts to and negotiate with state, federal and foreign agencies on matters which affect the marketing and distribution of fresh grapes."[27]  Over decades, the Commission has accumulated significant expertise in all areas relating to table grapes.

25.    The Commission is the only organization of its kind in the United States devoted to the table grape industry.  The statute creating the Commission requires California table grape producers to vote in a referendum every five years to decide whether to continue the Commission.  In 2022, 85% of the participating producers (representing 91% of the participating volume) voted to continue the Commission.  Ninety-nine percent of table grapes grown commercially in the United States are grown in California, such that the Commission effectively represents the interests of the entire U.S. table grape industry.  The Commission's work is funded by an assessment on California table grapes shipped during each marketing season.[28]

---

[26] *Id.* § 65572(k).

[27] *Id.* § 65572(i).

[28] *Id.* § 65600.

26.     Plaintiff National Grape Research Alliance is a voluntary research-focused membership organization that represents grape growers, processors, and wineries from all segments of the grape industry—wine, juice, table grapes (including organic table grapes), raisins, and nursery/rootstock—from all grape-growing regions of the United States.  Founded in 2005, the Alliance serves as the voice of the grape and wine industries to academic institutions, cooperative extension organizations, and federal research agencies like the USDA's Agricultural Research Service, the National Institute of Food and Agriculture, and APHIS.  The Alliance is committed to improving the grape industries and driving research to maximize their productivity, sustainability, and competitiveness.  It also is the only organization of its kind in the United States, devoted to all sectors and regions of the American grape and wine industry.  A list of the Alliance's officers and representatives is available at https://graperesearch.org/about-ngra/board-and-staff.[29]

27.     Plaintiff California Table Grape Export Association was created by the Commission in 2002 to facilitate exports, including by facilitating compliance with inspection requirements imposed by foreign governments.  For example, when Australia closed its market to U.S. table grapes after an outbreak of the Spotted Wing Drosophila on other crops in California, the Association worked directly with shippers; federal, state, and county regulators; and Australian government officials to manage and coordinate facility certifications and inspections of table grapes.

28.     Defendant U.S. Department of Agriculture is the federal agency charged with, among other things, protecting the nation's agriculture from dangerous, foreign pests and

---

[29] *See also Members & Membership*, National Grape Research Alliance, https://graperesearch.org/about-ngra/membership/ (listing Alliance grower members).

diseases from animals and plants.  The USDA is located at 1400 Independence Avenue SW, Washington, DC 20250.

29.    Defendant Thomas J. Vilsack is the Secretary of the U.S. Department of Agriculture.  He was most recently confirmed by the Senate on February 23, 2021.  He is sued in his official capacity.  His office is located at 1400 Independence Avenue SW, Washington, DC 20250.

30.    Defendant Michael Watson is the Administrator of APHIS, the USDA sub-agency that administers the Department's statutory functions related to animal and plant protection and that promulgated the Grape Import Notice.  He is sued in his official capacity.  His office is located at 4700 River Road, Riverdale, MD 20737.

## FACTUAL ALLEGATIONS

### I.    STATUTORY AND REGULATORY BACKGROUND

31.    Congress designed the Plant Protection Act (PPA), 7 U.S.C. § 7701 *et seq*., to protect the United States from "plant pests or noxious weeds" and the threats they pose to agriculture, the environment, and the economy.[30]  Congress passed the Plant Protection Act in 2000 as part of its longstanding quest to effectively detect and prevent invasive species.[31]  Congress warned that "articles capable of harboring plant pests," without regulated means to ensure safety and health, "could present an unacceptable risk of introducing or spreading plant pests."[32]  Far from guarding against remote risks, Congress acted aggressively with the PPA

---

[30] 7 U.S.C. § 7701(1).

[31] *See, e.g.*, 146 Cong. Rec. 9239, 9244 (May 25, 2000) (statement of Rep. Canady) (Plant Protection Act is designed to address "outdated and fragmented quarantine status that govern interdiction of prohibited plants and plant pests").

[32] 7 U.S.C. § 7701(7).

precisely because serious and costly incidents in the past led foreign pests to ravage fruit- and vegetable-growing regions across the United States.  Just one example is white-pine blister rust disease, which entered the United States from Germany and led to the passage of the PPA's predecessor, the Plant Quarantine Act.[33]

32.     The Plant Protection Act tasks the USDA Secretary with prohibiting the importation, entry, and movement of plants or plant products that threaten the introduction and dissemination of plant pests within the United States.[34]  Congress authorized the Secretary to do so by issuing "regulations" that, among other requirements, subject the imports to "remedial measures the Secretary determines to be necessary to prevent the spread."[35]  The "processes used in developing [these] regulations" must be "based on sound science" and "transparent and accessible."[36]  The USDA has delegated the authority to issue import regulations to APHIS.[37]

33.     Under current procedures, when APHIS considers change to import requirements, it prepares several documents.[38]  One such document is a pest risk assessment (PRA), which evaluates the risks associated with importation of the plant or plant product into the United States (in this case, table grapes from Chile).[39]  The PRA considers each "pest's potential to impact the

---

[33] *See* H.R. Rep. No. 398, at 5 (1912).

[34] 7 U.S.C. § 7712.

[35] *Id.* § 7712(c)(3).

[36] *Id.* § 7712(b).

[37] 7 C.F.R. §§ 2.22(a)(2)(xxxi), 2.80(a)(36); *see also* APHIS, *Our Mission*, https://www.aphis. usda.gov/mission (APHIS aims to protect "the health of U.S. agricultural and natural resources against invasive pests").

[38] *See, e.g.*, 7 C.F.R. § 319.56-4(c)(i), (ii) (requirement of a pest risk analysis).

[39] Grape Import Notice at 58,703.

United States by assessing its likelihood of entry and establishment in the United States."[40]  The PRA focuses only on certain, known pests, but does not consider *unknown* pests.

34.     APHIS also releases a commodity import evaluation document (CIED), which identifies phytosanitary measures that can be applied to mitigate pest risk and explains how APHIS considers each pest risk to be mitigated.[41]  For Chilean table grapes, the CIED accompanying the Grape Import Notice cites the operational workplan for technical and implementation details, even though the text of the operational workplan has not been released and the operational workplan has not been subject to any public comment.  These details in the operational workplan are key to APHIS's evaluation of whether a systems approach adequately prevents pests from entering the United States.[42]  APHIS has previously explained that "[i]nformation on the specific steps necessary to meet the requirements of the systems approaches are located in the operational workplan established between APHIS and the exporting country."[43]  It has also explained that "operational workplans are binding documents. Every operational workplan includes a detailed description of the objectives, proposed activities, and expected results and benefits of the importation of a specific commodity and the related roles responsibilities, and resources contributed by each signatory."[44]

---

[40] *Id.* at 58,705.

[41] APHIS, Notice of Proposed Revision to Requirements for the Importation of Grapes From Chile Into the United States, 87 Fed. Reg. 62,783, 62,784 (Oct. 17, 2022) [hereinafter 2022 Proposed Notice].

[42] *See* 2024 CIED at 4-6.

[43] Establishing a Performance Standard for Authorizing the Importation and Interstate Movement of Fruits and Vegetables, 83 Fed. Reg. 46,627, 46,632 (Sept. 14, 2018) (to be codified at 7 C.F.R. pts. 318, 319).

[44] *Id.* at 46,631.

## II.   APHIS SHIFTS FROM REGULATIONS ADOPTED AFTER NOTICE AND COMMENT TO A NOTICE-BASED REGIME

35.    As late as 2010, APHIS regulations codified in the Code of Federal Regulations embodied the requirement that table grapes from Chile be fumigated with methyl bromide.[45]

36.    Starting in 2010, APHIS began a process designed, apparently, to avoid compliance with APA rulemaking requirements.  Specifically, APHIS moved many of its binding import requirements from regulations (codified in the Code of Federal Regulations) into an online database—the Plant Protection and Quarantine (PPQ) Treatment Manual, which is not published in the Federal Register or Code of Federal Regulations.[46]  Having shifted binding regulatory requirements to the online PPQ Treatment Manual, APHIS announced that import requirements could be changed through what APHIS deems to be an "informal adjudication" and "notice-based process."[47]  APHIS overhauled its procedures in the name of administrative efficiency, rationalizing this switch to a notice-based regime instead of rulemaking as simplifying the process for adding, changing, and removing binding import requirements.[48]

37.    By 2017, some requirements for some products from certain countries remained in APHIS's regulations.  For example, there were rules for grapes from South Korea and for tree fruits, citrus, kiwis, and pomegranates from Chile.[49]  But the regulation mandating methyl bromide fumigation for grapes from Chile had been shifted to the online database in 2010.

---

[45] *See* 7 C.F.R. § 305.2 (revised Feb. 2, 2010).

[46] Phytosanitary Treatments; Location of and Process for Updating Treatment Schedules, 75 Fed. Reg. 4,228 (Jan. 26, 2010) (to be codified at 7 C.F.R. pts. 301, 305, 318, 319, 330, 352).

[47] *See* 83 Fed. Reg. at 46,627 ("The notice-based process is an informal adjudication process").

[48] 75 Fed. Reg. at 4,237.

[49] 7 C.F.R. § 319 *et seq.* (2017).

38.     In 2018, APHIS eliminated remaining region- and commodity-specific requirements in the regulations in favor of a notice-based approach for all commodities.[50]

39.     The notice-based regime works as follows.  "If the Administrator determines that any of the phytosanitary measures required for a fruit or vegetable that has been authorized [for] importation under this subpart are no longer necessary to reasonably mitigate the pest risk posed by the fruit or vegetable, APHIS will make new pest risk documentation available for public comment … prior to allowing importation … subject to the phytosanitary measures specified in the notice."[51]  In effect, then, under APHIS's novel notice-based process, by the time that stakeholders have the opportunity to comment on relaxed phytosanitary measures, APHIS has already "determine[d]" that existing measures are unnecessary.

III.    THE IMPORTATION OF TABLE GRAPES FROM CHILE INTO THE UNITED STATES

A.      In 2008, APHIS Proposes A Rule To Adopt A Systems Approach But Later Abandons It After An Unexpected Pest Appears In Chile

40.     In 2008, based on a request of the Chilean national plant protection organization, known as SAG, APHIS published a proposed rule to allow the importation of table grapes from Chile into the continental United States under a systems approach.[52]  When considering the associated risks, APHIS focused singularly on the threat posed by the Chilean false red mite.[53]  Around that time, APHIS considered the Chilean false red mite to be the only pest in Chile that

---

[50] 83 Fed. Reg. at 46,627.

[51] 7 C.F.R. § 319.56-4(c)(4)(ii).

[52] 73 Fed. Reg. at 50,577.

[53] *See* Commodity Import Evaluation Document, Systems Approach for Grapes Vitis vinifera L. Imported from Chile into the Continental United States, Doc. No. APHIS-2007-0152-0002 (Nov. 2, 2007), https://www.regulations.gov/document/APHIS-2007-0152-0002 [hereinafter 2008 CIED].

posed a high risk potential for the United States.[54]  Still, APHIS identified 23 other pests with a medium risk potential.[55]

41.     Commenting on that proposed rule, the Commission warned APHIS of reports from within Chile of the European grapevine moth.[56]  The Commission's warning was unfortunately prescient.  Within months, the moth's presence in Chile led APHIS to abandon the proposed rule for a systems approach.[57]  The European grapevine moth spread throughout Chile, ultimately affecting over 60% of Chilean grape vineyards, as APHIS later recognized.[58]  APHIS was forced to acknowledge that the systems approach, proposed by Chile, had not included measures that were specific to the European grapevine moth.[59]

42.     In reviewing the science and comments, APHIS did not finalize the proposed rule and continued to require that table grapes imported from Chile be treated with methyl bromide fumigation.  As APHIS implicitly recognized in the 2022 Proposed Notice, methyl bromide fumigation mitigated the risk of the European grapevine moth in a way that a systems approach could not.[60]

---

[54] 2009 PRA at 60.

[55] *Id.*

[56] *See* Comment of Kathleen Nave, California Table Grape Commission, Doc. No. APHIS-2007-0152-0015 (Oct. 24, 2008), https://www.regulations.gov/comment/APHIS-2007-0152-0015.

[57] Grape Import Notice at 58,703.

[58] 2024 CIED at 2.

[59] 2022 Proposed Notice at 62,783.

[60] *Id.* ("Since [the 2008 EGVM Chile outbreak], we have continued to require that table grapes imported from Chile receive methyl bromide fumigation, which also mitigates the risk of EGVM.").

B.      **A European Grapevine Moth Outbreak In California Costs Stakeholders $100 Million, Confirming The High Risk Of Imported Pests**

43.      For decades, there has not been a documented case of a pest establishing itself in the United States after entering on Chilean table grapes.  This perfect record for Chilean table grapes in recent years is undoubtedly due to the efficacy of requiring fumigation with methyl bromide.  Copious research supports methyl bromide's use for grape treatment, and methyl bromide is particularly effective at killing essentially all pests, known or unknown.[61]

44.      The costs and impacts associated with the detection of a pest in the United States are not distant memories to APHIS or U.S. fruit producers.  As referenced above, the European grapevine moth was discovered in Napa County, California in 2009.  By 2010, 100,000 moths had been captured.[62]  As APHIS explained, "[f]emales can lay up to 160 eggs per cycle," "there may be up to four generations per year in California," and "[n]ewly hatched larvae are highly mobile."[63]  European grapevine moth can feed on "a wide range of fruit and ornamental plants, including:  blackberry, bladder campion, carnation, currant, European barberry, European privet, false baby's breath, gooseberry, jujube, kiwi fruit, old-man's-beard or traveler's joy, olive, persimmon, pomegranate, red clover, rosemary, sea squill, spurge flax, St. John's wort or Klamath weed, and various stone fruits."[64]  APHIS noted that the European grapevine moth

---

[61] CTGC Comments on Systems Approach for Chilean Table Grapes, Doc. No. APHIS-2021-0078-0039, at 4-5 (Jan. 17, 2023), https://www.regulations.gov/comment/APHIS-2021-0078-0039 [hereinafter CTGC Comments] (detailing literature); *see, e.g.*, Patrick Ducom, *Methyl Bromide Alternatives*, Proceedings of the 9th International Conference on Controlled Atmosphere and Fumigation in Stored Products 205, 205-206 (2012).

[62] European Grapevine Moth Post-Eradication Response Guidelines, *supra* n.16.

[63] APHIS, Movement of Grapes and Other Regulated Articles from the European Grapevine Moth (*Lobesia botrana*) Quarantine Zone 1 (2010) at 1, https://www.aphis.usda.gov/sites/default/files/egvm-ea.pdf [hereinafter Movement of Grapes].

[64] U.C. Riverside Center for Invasive Species Research, *European Grapevine Moth*, CISR, https://cisr.ucr.edu/invasive-species/european-grapevine-moth.

"attacks many hosts," but "grapes are the primary host and … the most economically vulnerable commodity."[65]  APHIS published a map showing the risk of the moth spreading widely throughout the continental United States[66]:



Figure 1.  Risk map for *L. botrana* within the continental United States.

45.  Quarantine and eradication efforts demanded large-scale coordination among numerous stakeholders.  APHIS established quarantine zones to restrict the movement of grapes within the United States and imposed fumigation mandates for table grapes harvested near

---

[65] APHIS, Movement of Grapes, *supra* n.63, at 1.

[66] *Id*. at 8.

infested vineyards.[67]  APHIS explained that "fresh grapes, which will primarily be grapes for table use, are at the highest risk of harboring live EGVM larvae.  Fresh grapes harvested from vineyards with no detection of the European grapevine moth must be inspected to verify freedom from the pest."[68] APHIS further "determined that inspection alone may not prove adequate to prevent the artificial movement of the European grapevine moth.  Therefore, fresh grapes which are harvested from vineyards near a positive detection of the European grapevine moth must be fumigated with methyl bromide to ensure that any moths in the shipment are no longer viable before moving outside of the quarantine zone."[69]  APHIS concluded that "the proposed use of methyl bromide … poses minimal risk to human health" and that "[c]onsumers are unlikely to be impacted by handling a commodity which has been fumigated with methyl bromide because methyl bromide quickly dissipates from the surface of the commodity once it has been removed from the fumigation facilities."[70]

46.    APHIS noted that, without aggressive action, the European grapevine moth would "spread into noninfested areas of the United States through the movement of EGVM host material, especially fresh grapes," as "[c]limate conditions in major grape-producing areas favor the establishment of EGVM."[71]  "[C]rop damage to vineyards could be up to 80 to 90 percent in some circumstances."[72]  In addition, APHIS anticipated that the "introduction of EGVM into the

---

[67] *Id*. at 2.

[68] *Id*.

[69] *Id*.

[70] *Id*. at 13.

[71] *Id*. at 7.

[72] *Id*.

United States could affect trade with some countries due to additional regulations or restrictions placed on exports of host crops by the importing countries."[73]

47.     The aggressive, coordinated eradication efforts eventually succeeded in eliminating the European grapevine moth from California, but they took seven years and cost taxpayers and California's grape industry an estimated $100 million on top of the direct economic damage sustained.  Even that high price tag is overshadowed by the $5.7 billion in fruit crops that was at risk.[74]  Fumigation prevents the risks and costs of the European grapevine moth and other pests in Chile from falling on U.S. grape producers.

**C.     The Chilean Government Again Requests That APHIS Revise The Table Grape Import Requirements To Allow A Systems Approach**

48.     When APHIS appropriately declined to permit importation of Chilean table grapes under a systems approach in 2008, the agency protected domestic stakeholders and crops from a pest that emerged before the systems approach could be finalized.  For an outbreak of the European grapevine moth or some other pest under the newly revised systems approach, quarantine and eradication efforts would be at least as expensive as the previous eradication campaign.  APHIS's nearly two-decade commitment to requiring fumigation is consistent with, and indeed faithful to, the agency's statutory obligation to protect the domestic grape industry, especially over foreign interests.

49.     Yet when Chile's national plant protection organization again requested that APHIS revise the import requirements for Chilean table grapes, APHIS obliged, shifting pervasive and grave pest risks from the Chilean table grape industry onto domestic stakeholders.

---

[73] *Id.*

[74] El-Lissy, *From Over 100,000 to 1*, *supra* n.18.

24

50.    In response to Chile's request, APHIS prepared a new pest risk assessment, commodity import evaluation document, and a two-page economic effects assessment,[75] all through what APHIS deemed an informal adjudication with a 2022 Proposed Notice alerting stakeholders of its intent to permit a systems approach.[76]

51.    In these documents, APHIS failed to contend with many of the relevant facts regarding Chilean table grape imports.  For example, the shipping seasons for table grapes from California and Chile are partially complementary, but the two seasons overlap at the end of the U.S. season in December and January, and again at the beginning of the U.S. season in May and June.[77]  APHIS's assumption that the Chilean season ends in May, and subsequently its relatively small estimate of the systems approach's impact on export volumes, failed to acknowledge the considerable shipments of Chilean grapes that supply the United States market from cold storage through the middle of June.[78]

52.    In the latest pest risk assessment, APHIS did not explain why the overall risk for the Chilean false red mite was lowered from high risk potential in the 2009 PRA to a medium risk in the 2022 PRA.[79]  Nor did APHIS explain why the overall risk for six other pests was

---

[75] APHIS, Economic Effects Assessment:  Importation of Table Grapes from Chile, Doc. No. APHIS-2021-0078-0003 (Oct. 17, 2022), https://www.regulations.gov/document/APHIS-2021-0078-0003 [hereinafter 2022 Economic Effects Assessment].

[76] 2022 Proposed Notice at 62,783.

[77] *See* California Table Grape Commission, *All About Grapes*, https://tinyurl.com/9nw3rwt5 (shipping season for Californian table grapes lasts from May through January).

[78] USDA Foreign Agricultural Service, *Table Grape Production in Chile – Field Visit to the Atacama Region* 4 (Feb. 16, 2022), https://www.fas.usda.gov/data/chile-table-grape-production-chile-field-visit-atacama-region (shipping season for Chilean table grapes lasts from December through May).

[79] *Compare* 2009 PRA at 60, *with* 2022 PRA at 1.

reduced from medium in 2009 to low in 2022.[80]  And APHIS failed to explain why many of the sixteen pests that posed a medium risk potential in 2009 were not carefully considered or even were totally disregarded in 2022.[81]

53.     The 2022 Economic Effects Assessment is only two pages long and fails to grapple with the potential economic impacts of the systems approach on the domestic grape industry.  Indeed, the 2022 Economic Effects Assessment is most notable for what it does *not* say.  Although it offers a few statistics about recent grape imports from Chile, it does not cite any outside sources to support its analysis or its simplistic methodology.

54.     Chilean officials, on the other hand, recognize the lucrative and expanded market that a systems approach will allow.  In 2022, the Ministerial Regional Secretary of Agriculture, Hernan Saavedra, noted that a "year-round grape export season … creates a good job opportunity for our farmers."[82]  That same year, the Minister of Agriculture, Esteban Valenzuela, estimated after a meeting with USDA Secretary Vilsack that implementing a systems approach for Chilean grapes would generate a 60% increase in export value for Chile, from $400 million to $650

---

[80] *Compare* 2009 PRA at 60, *with* 2022 PRA at 1.  Those six pests are the Chilean fruit tree leaf folder (*Proeulia auraria*), the Mexican cabbage heartworm (*Copitarsia decolora*), *Accuminulia buscki*, *Chileulia stalactitis*, *Proeulia chrysopteris*, and *Proeulia triquetra*.  Even looking at just the likelihood of introduction in the 2009 PRA, APHIS did not explain in 2022 why that likelihood decreased from medium to low for all six of those pests.

[81] *Compare* 2009 PRA at 60, *with* 2022 PRA at 1.  As just one example, the 2009 PRA identified *Blapstinus punctulatus* as posing a medium risk potential, with "specimens … intercepted on various fruits from Chile imported for consumption."  2009 PRA at 58; *see id.* at 26-28, 60.  That pest is not mentioned anywhere in the 2022 PRA.

[82] PortalPortuario, *Coquimbo:  Authorities Meet with ASOEX, APHIS and USDA to Evaluate the Scope of Systems Approach for Table Grapes* (Aug. 5, 2022), https://tinyurl.com/3j9r9mvd (text and title translated from Spanish).

million annually.[83]  None of this is mentioned, much less assessed, in APHIS's analysis, which "suggests that the impacts on the domestic organic grape market would not be economically significant."[84]

55.     More troubling than APHIS's flimsy assertion that the systems approach will not significantly affect export volumes was the 2022 Economic Effects Assessment's failure to discuss at all the economic impacts of a pest outbreak.  The 2022 Economic Effects Assessment does not acknowledge the harm that would result from a quarantine pest becoming established in the United States, in large part because APHIS's analysis simply assumes that a systems approach eliminates essentially all pest risk.  Domestic stakeholders and taxpayers spent $100 million on eradication efforts alone in California after the 2009 EGVM outbreak, and APHIS is undoubtedly aware that the systems approach increases the risk of pests spreading and is not foolproof.  In proposing a systems approach, APHIS failed to conduct and provide a sound economic analysis of the associated risks, including the risk of a pest outbreak.

56.     Upon shifting to the notice-based regime with import requirements listed in the PPQ Treatment Manual, APHIS no longer deemed it necessary to perform a regulatory flexibility analysis (RFA) in connection with new import requirements.  Before APHIS issued the 2022 Proposed Notice, it also apparently concluded that it was not required to produce an environmental impact statement or environmental assessment.  Thus, when APHIS published the

---

[83] Chile Ministry of Agriculture, *Minister Valenzuela Holds Working Meeting with U.S. Secretary of Agriculture to Accelerate the Implementation of the Systems Approach for Table Grapes* (June 6, 2022), https://www.minagri.gob.cl/noticia/ministro-valenzuela-sostiene-reunion-de-trabajo-con-secretario-de-agricultura-de-eeuu-para-acelerar-puesta-en-marcha-del-systems-approach-para-la-uva-de-mesa/ (title translated from Spanish).

[84] 2024 Economic Effects Assessment at 2.

2022 Proposed Notice, it did not publish a regulatory flexibility analysis, an environmental

impact statement, or an environmental assessment alongside the notice.

### D.      Comments On The Proposed Notice Raise Substantial Questions About The Viability Of The Systems Approach

57.      In response to the 2022 Proposed Notice, stakeholders, including Plaintiffs,

provided extensive comments on the critical gaps and shortcomings of APHIS's repudiation of

the longstanding requirement that Chilean table grapes undergo fumigation to prevent the spread

of pests that would inflict severe damage on U.S. industry.

58.      *Failure to Disclose the Operational Workplan and Data and Studies Relied Upon*.

Commenters, including the Commission, requested access to the operational workplan so that,

before the systems approach was adopted, the public could meaningfully address critical aspects

of the 2022 Proposed Notice systems approach that were not yet made public.[85]  The 2022 CIED

requires that SAG, Chile's national plant protection organization, "provide an operational

workplan to APHIS for approval that details the activities and responsibilities that SAG will

carry out to meet the requirements of the systems approach."[86]  Because the CIED itself fails to

disclose the contents of the workplan, the Commission, among others, asked APHIS to release

the document to the public because it is crucial for understanding how production sites in Chile

will implement the systems approach.  Further, because the CIED leaves significant gaps that can

---

[85] CTGC Comments at 20-21.  An operational workplan is a "binding document[]" that includes a "detailed description of the objectives, proposed activities, and expected results and benefits of the importation of a specific commodity and the related roles, responsibilities, and resources contributed by each signatory."  83 Fed. Reg. at 46,631.

[86] Commodity Import Evaluation Document:  Phytosanitary Options (Systems Approach, Irradiation, or Methyl Bromide Fumigation) for the Importation of Table Grapes *Vitis vinifera* L. for Consumption from Chile into the United States, Doc. No. APHIS-2021-0078-0002, at 4 (May 27, 2022), https://www.regulations.gov/document/APHIS-2021-0078-0002 [hereinafter 2022 CIED].

be filled only by the operational workplan, the Commission requested an additional comment period to allow stakeholders to review the current workplan and to provide written comments before APHIS adopted a systems approach.  Commenters also requested access to the underlying data supporting pilot program studies relied upon by APHIS.

59.     As commenters highlighted, the 2022 PRA and CIED reference numerous documents, studies, and other data that have not been disclosed to the public.  For example, as one commenter explained, for the certification of areas with low prevalence of the Chilean false red mite, the CIED relies exclusively on mite sampling data collected by SAG in 2002 and 2007 during two pilot programs conducted during the 2002-2003 and 2006-2007 Chilean grape seasons.  Although APHIS asserted that the results of this "pilot study provide[] sufficient evidence that a systems approach" will "effectively remove[]" the Chilean false red mite "from the importation pathway,"[87] the agency did not to provide the underlying studies and data for review.  Commenters explained that without the underlying data relied on by APHIS, it is impossible to review and evaluate whether the analyses and conclusions cited in the 2022 PRA and CIED are accurate or sufficiently supported, and thus whether a change to the systems

---

[87] *Id.* at 10.

approach is itself supported by underlying data,[88] depriving the Commission and other

commenters of a meaningful opportunity to comment.[89]

60.     *Failure to Consider Alternatives.*  The Commission raised the issue of APHIS's

failure to consider effective alternatives to fumigation with methyl bromide in deciding to make

the seismic shift to a systems approach.[90]  The Commission pointed out APHIS's failure to

consider whether fumigation with methyl bromide could be replaced with another fumigation

technique that could combat quarantine pests more effectively than a systems approach.  The

Commission explained that research demonstrates that ethyl formate, phosphine, and ozone

---

[88] Indeed, commenters have been requesting this underlying data since 2008, when APHIS first considered permitting the systems approach.  *See* Comment from Michael Bryan, Michigan Department of Agriculture, Doc. No. APHIS-2007-0152-0012 (Oct. 24, 2008), https://www.regulations.gov/comment/APHIS-2007-0152-0012 ("I would feel much more confident in the claims of this proposal if the results of that project were available as an appendix to this proposal.  I was unable to find a copy of the 2002 and 2007 reports from Servicio Agricola y Ganadero reference[d] in the proposal.  So, we cannot assess what level of sampling, what scope of the production region, or what number of vineyards was sampled for the pilot programs."); Comment from M. Martin, California Grape & Tree Fruit League, Doc. No. APHIS-2007-0152-0017 (Oct. 27, 2008) https://www.regulations.gov/comment/APHIS-2007-0152-0017 ("[W]e have two questions:  first, how the sampling rate was determined, as sample size is very important when considering that chemical applications should greatly reduce the ability to make detections, and second, if the Chilean National Plant Protection Organization (NPPO) conducted surveillance to determine low prevalence areas (all vineyards in each production region?).  Specifically, to determine sample size, we question whether vineyards were tested in areas of low level populations; vineyards were tested within all 12 eligible regions; vineyards were tested following a valid control for *B. chilensis*; and if the sample was based on estimated yield from each producing region, as this information is important when identifying an appropriate sampling rate and one that is not biased.").

[89] *See e.g.*, *American Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 236 (D.C. Cir. 2008) ("'Among the information that must be revealed for public evaluation are the 'technical studies and data' upon which the agency relies.'" (quoting *Chamber of Commerce v. SEC*, 443 F.3d 890, 899 (D.C. Cir. 2006))); *Connecticut Light & Power Co. v. Nuclear Regulatory Comm'n*, 673 F.2d 525, 530 (D.C. Cir. 1982) ("'In order to allow for useful criticism, it is especially important for the agency to identify and make available technical studies and data that it has employed in reaching the decisions to propose particular rules.'").

[90] CTGC Comments at 5-8.

could serve as possible alternatives, either individually or in combination with each other or other treatments.[91]  Indeed, the Commission pointed out that APHIS was already monitoring a trial involving the fumigation of table grapes with ethyl formate,[92] and phosphine was already an approved fumigant for some other commodities.  The Commission further pointed to research on a synergistic combination of carbon dioxide, sulfur dioxide, and cold treatment.[93]  Perhaps most importantly, the Commission pointed out that fumigation can be effective at killing both known and unknown pests—of particular relevance considering that APHIS's previous attempt to implement a systems approach in 2008 was halted by the devastating outbreak of the European grapevine moth, which was until then not a known pest in Chile.

61.   *Failure to Consider Cumulative Risk of Pests.*  The Commission highlighted a fundamental flaw in APHIS's pest risk assessment:  the agency's failure to consider the cumulative risk presented by the large number of quarantine pests associated with Chilean table grapes.[94]  As the Commission pointed out, while the 2022 PRA analyzes the risk presented by individual quarantine pests, it does not address the cumulative risk posed by all pests.  Each pest does not exist in a vacuum and contributes to a cumulative risk that must be considered.  Indeed, APHIS itself concluded that the European grapevine moth and the Chilean false red mite each pose a medium risk, and that nine other known pests pose a low risk.  Despite identifying each of

---

[91] *See, e.g.*, Byung-Ho Lee et al., *The Efficacy, Phytotoxicity, and Safety of Liquid Ethyl Formate Used to Control the Grape (Campbell Early) Quarantine Pest* Pseudococcus Comstocki, 12 Applied Sci. 9769 (2022); A.E.R. Friedemann et al., *Phosphine Fumigation – Time Dependent Changes in the Volatile Profile of Table Grapes*, 393 J. Hazardous Materials 122, 480 (2020); Spencer Walse et al., *Postharvest Fumigation of California Table Grapes with Ozone to Control Western Black Widow Spider*, Postharvest Boil. Technol. (2017).

[92] Western Fumigation, *The Future of Methyl Bromide* (Mar. 20, 2024), https://tinyurl.com/5xzzdjjy.

[93] CTGC Comments at 8.

[94] *Id.* at 9.

the 11 pests as presenting a risk, APHIS abruptly concluded its analysis without considering the combined risk posed by 11 quarantine pests.

62. *Failure to Consider Risk of Unknown Pests*. The Commission flagged that, beyond known pests, APHIS did not consider "the risk posed by unknown future pests."[95] As the Commission explained, by focusing on only two pests, the proposed systems approach provides inadequate protection against emerging risks. By the time the systems approach could be adjusted to account for new threats, it would be too late. As explained above, the last time APHIS considered a systems approach for Chilean table grapes, the approval process fell apart when the European grapevine moth unexpectedly appeared in Chile and fortunately was discovered just in time—an example of the unknown risks APHIS did not address in its pest risk assessment.[96]

63. *Risk of Gamesmanship and Accidents*. The Commission implored APHIS to consider the risks of gamesmanship and accidents.[97] Because unfumigated grapes are more competitive in the market, Chilean grape growers are motivated to adopt the systems approach whenever possible and to ignore the existence of pests so that they can certify compliance for systems approach eligibility. Further, as the Commission highlighted, accidents happen and measures for the systems approach can fail, like commingling of grapes between production sites that allows quarantine pests to slip through the cracks.

64. *Region with High Prevalence of the European Grapevine Moth*. The Commission raised a number of other issues in its comments on the 2022 Proposed Notice, which were

---

[95] *Id.* at 14.

[96] 2022 Proposed Notice at 62,783.

[97] CTGC Comments at 14.

specific to the gaps and assumptions inherent in the 2022 PRA, 2022 CIED, and 2022 Economic Effects Assessment.  One notable comment was the need to eliminate the Valparaíso region from eligibility for the systems approach because, contrary to the 2022 Proposed Notice's assertion, it is not a region with a low prevalence of the European grapevine moth.[98]

### E.    APHIS Issues The Final Grape Import Notice

65.     After receiving comments from the Commission and other stakeholders, APHIS did not adopt the systems approach for the remainder of the 2022-2023 Chilean grape season, nor did it adopt the systems approach for the 2023-2024 Chilean season.  It was reported that the U.S. government decided to use the systems approach as a bargaining chip in broader bilateral negotiations with Chile.  Specifically, the U.S. government reportedly objected to Chile's recognition of certain European geographical indications.[99]

66.     In July 2024, it was reported that the United States and Chile reached an agreement on European geographical indications that would allow the labels of many U.S. products in Chile to remain unchanged.[100]

67.     On July 18, 2024, after a year and a half of silence, APHIS suddenly made the Grape Import Notice available online.  It became effective the next day, on July 19, 2024.  In the Grape Import Notice, APHIS reaffirmed the determination that table grapes from certain regions

---

[98] *Id.* at 24.

[99] Fresh Fruit Portal, *Chilean Table Grapes:  Struggle to Get Systems Approach Approved* (Oct. 23, 2023), https://tinyurl.com/4nfx5tbw.  A geographical indication is "a sign used on products that have a specific geographical origin and possess qualities or a reputation that are due to that origin," such as a "Swiss made" watch from Switzerland.  WIPO, *Geographical Indications*, https://tinyurl.com/5yrye622.

[100] Larry Lee, *U.S. and Chile Reach Agreement on Common Food Names*, Brownfield (July 2, 2024), https://tinyurl.com/5czpu6e9.

of Chile may be safely imported into the United States under a systems approach, which supposedly protects against the European grapevine moth and the Chilean false red mite.

68.     With the Grape Import Notice, APHIS released a revised version of the commodity import evaluation document (the 2024 CIED)[101] and a revised version of the economic effects assessment (the 2024 Economic Effects Assessment).[102]  These "revisions," however, only confirm that APHIS had in 2022 determined to adopt a systems approach and made up its mind on the vast majority of the details for the systems approach.

69.     Despite public comments requesting critical aspects of the systems approach contained only within the operational workplan, and despite stakeholders requesting an opportunity to review and comment on that workplan information, APHIS issued the Grape Import Notice and certain corresponding documents, while refusing to publish the workplan or the requested underlying data related to its studies to provide additional opportunity for comment.  APHIS thus refused to reveal key details of the systems approach and the obligations of Chile's national plant protection organization, along with APHIS's assessment of the likelihood of efficacy, under the systems approach.

70.     The 2024 CIED requires that Chile's national plant protection organization, SAG, work with APHIS to "develop an operational workplan that details the activities and responsibilities that SAG will carry out to meet the requirements of the systems approach."[103] The 2024 CIED failed to disclose the contents of the operational workplan.

---

[101] 2024 CIED.

[102] APHIS, Economic Effects Assessment:  Importation of Table Grapes from Chile, Doc. No. APHIS-2021-0078-0054 (July 12, 2024), https://www.regulations.gov/document/APHIS-2021-0078-0054 [hereinafter 2024 Economic Effects Assessment].

[103] 2024 CIED at 4.

71.     Although the 2024 CIED notes APHIS's selection of a 6% infestation rate with 95% confidence as the sampling standard for the Chilean false red mite, APHIS declined to provide the data of the surveys supporting the infestation rate, asserting that such critical details are "best kept" in the operational workplan that it declined to disclose during the comment period.[104]

72.     APHIS refused to disclose the operational workplan for public comment despite its own assertion that the workplan "contains guidance on the detailed implementation of the systems approach that is outlined in the CIED without expanding or reducing its scope" and that the workplan "allows APHIS to adjust the details of how to execute the systems approach, within the bounds of the requirements laid out in the CIED, in response to situations such as changes in pest distribution and/or population density within a particular region, or technological advances."[105]

73.     Almost two months after the Grape Import Notice, APHIS provided select industry stakeholders a high-level summary of the operational workplan but made clear that it would not take any comments and the workplan was not subject to further revisions based on public input.  APHIS did not release the text of the workplan, and to this day, Plaintiffs and the U.S. public have not been shown the operational workplan, much less been provided an opportunity to comment on the critical details that it contains.  APHIS has also still declined to provide the underlying data from the pilot programs, noting only that data summaries are in the CIED and that there were no detections of live mites during the inspections performed in Chile

---

[104] Grape Import Notice at 58,709.

[105] *Id.* at 58,704, 58,709.

or in the United States.  It did not respond to or address comments about the need for the data itself.

74.     In publishing the Grape Import Notice, APHIS addressed the Commission's request to require that visual inspections be conducted using illuminating lamps.[106]  Emblematic of the problem with refusing to disclose key aspects of the systems approach, APHIS asserted that "details on the implementation of the requirements laid out in the CIED will be included in the operational workplan."[107]  Despite this ambiguity, APHIS went on to selectively "confirm that inspection tables are equipped with illumination to facilitate suitable visual detection of pests."[108]

75.     In the Grape Import Notice, APHIS failed to sufficiently address the critical shortcomings the Commission identified in its comments.

76.     *Failure to Consider Alternatives.*  APHIS's decision to forgo fumigation with methyl bromide in many instances was an attempt to reduce use of that chemical for environmental reasons, not because a decrease in methyl bromide is most effective for pest management.[109]  Yet even if APHIS's goal were to reduce the use of methyl bromide, the agency issued the final Grape Import Notice and the 2024 CIED without meaningfully addressing the possibility of using alternative fumigation methods that do not raise similar environmental concerns.  APHIS claimed that its options were limited based on what Chile's national plant protection organization put before it.  When determining whether to expose wide swathes of U.S. industry to the risk of foreign pests, APHIS in the final Grape Import Notice remarkably said that

---

[106] CTGC Comments at 25.

[107] Grape Import Notice at 58,710.

[108] *Id.*

[109] *See* Dawson, *supra* n.13.

evaluation of alternative fumigation methods would be "inconsistent with [APHIS's] regulatory process" because Chile "did not ask us to evaluate other fumigation methods."[110]  According to the Grape Import Notice, therefore, APHIS was not obligated to consider and thus ignored a basic aspect of the purported problem it seeks to address by blinding itself to any options besides the sole option preferred by Chile.

77.   *Failure to Consider Cumulative Risk of Pests.*  In the Grape Import Notice, APHIS asserted that arguments from the Commission and another commenter regarding the cumulative risk of quarantine pests were "based on faulty assumptions."[111]  In particular, APHIS accused the Commission of wrongly assuming that "each pest is biologically similar in terms of its plant pest status, each has a commensurate likelihood of attacking the grapes, each is commensurately likely to survive shipment to the United States, and each is commensurately likely to become established in the United States."[112]  The Commission made none of those assumptions.[113]  Notably, APHIS could not and did not deny that the cumulative risk posed by *all* quarantine pests is higher than the individual risk posed by a single quarantine pest.[114]

78.   *Failure to Consider Risk of Unknown Pests*.  APHIS acknowledged in the Grape Import Notice that the systems approach is not designed to mitigate risks posed by unknown pests.  Specifically, APHIS stated that, "[i]f a previously unknown quarantine pest relevant to the importation of table grapes from Chile arises in the future, APHIS will reassess the associated

---

[110] Grape Import Notice at 58,705.

[111] *Id.*

[112] *Id.*

[113] CTGC Comments at 9.

[114] *See* Grape Import Notice at 58,705.

pest risk" and potentially "revise the import restrictions accordingly."[115]  In other words,

APHIS's proposed approach is to wait until it is too late to most effectively combat unknown

pests.  APHIS's wait-and-see approach is not sufficient to discharge its statutory responsibilities.

79.     *Risk of Gamesmanship and Accidents.*  In the Grape Import Notice, APHIS

cursorily responded to concerns regarding accidents by stating that "[p]rotocols will be in place

in packinghouses to prevent comingling [sic] of systems approach and non-systems approach

grapes, such as separate timing of the arrival of grapes grown under the systems approach and

separate storage areas."[116]  These measures were not previously disclosed, and APHIS offered no

further details about them in the Grape Import Notice, stating instead that the details "will be

included in the operational workplan."[117]  Similarly, APHIS revealed in the Grape Import Notice

that vineyards bordering regions that are ineligible for the systems approach "will be subject

to … necessary trapping and survey requirements to ensure freedom from quarantine pests."[118]

For this new revelation, APHIS did not indicate which vineyards will be deemed to border

ineligible regions (e.g., only vineyards that physically touch the border or all vineyards within a

certain distance of the border).  Finally, in terms of gamesmanship, APHIS stated only that any

manipulation of the systems approach will be met with consequences, such as ineligibility for the

systems approach until unspecified "corrective action" is taken.[119]

80.     *Region with High Prevalence of the European Grapevine Moth.*  The Grape

Import Notice and 2024 CIED kept Valparaíso among the list of regions in Chile where grapes

---

[115] *Id.* at 58,707.

[116] *Id.*

[117] *Id.*

[118] *Id.*

[119] *Id.*

are eligible for the systems approach, despite the prevalence of the European grapevine moth in that region.  Available data shows that, during the 2018-2019 season, there were 91 captures of the moth in Valparaíso by the end of the first flight.[120]  Those captures were made in 54 different traps.[121]  Of the 91 captures in Valparaíso, 74 captures occurred in 35 different table grape vineyards.[122]  In the Grape Import Notice, APHIS relied on new data for the 2023-2024 season that was not previously available to the Commission.  According to APHIS, captures of the moth in Valparaíso "decreased" since the 2018-2019 season with 78 adult moths captured in Valparaíso during the latest one-year period.[123]  That prevalence of the moth is still unacceptably high for grapes from Valparaíso to be eligible for a systems approach.

81.     Before APHIS issued the Grape Import Notice, APHIS believed that it was not required to produce an environmental impact statement or environmental assessment.  Because of its earlier shift to a notice-based regime with import requirements listed in the online database, APHIS likewise believed that it did not need to perform a regulatory flexibility analysis.  Thus, when APHIS published the Grape Import Notice, it did not publish an environmental impact statement, an environmental assessment, or a regulatory flexibility analysis alongside the notice.

---

[120] Ex. 1 (2022-APHIS-05238-F_000415).

[121] *Id.* (2022-APHIS-05238-F_000416).

[122] *Id.* (2022-APHIS-05238-F_000416 to 2022-APHIS-05238-F_000417).

[123] Grape Import Notice at 58,708.

F.      **Effects of the New Systems Approach on Plaintiffs**

82.    The importation of Chilean table grapes under a systems approach creates a credible threat, significant risk, and substantial probability that Plaintiffs will suffer direct economic, environmental, and other phytosanitary risks.[124]

83.    *Plaintiffs and the growers they represent are currently undertaking protective measures that guard against the effects of the Grape Import Notice.*  Growers, including members represented by Plaintiffs, are incurring costs to monitor for invasive species, including the European grapevine moth.  For example, the Napa County Winegrape Pest and Disease Control District collects an assessment from growers of $9.15 per planted acre of winegrapes to fund efforts relating to inspection, detection, and prevention of pests.[125]  It monitors for the European grapevine moth, as well as other known pests and certain pests not known to occur in the United States.  Robust monitoring is critical to protect against the effects of the shift to a systems approach.

84.    The Commission has suffered direct economic harm due to the cost of protective measures that the Commission is undertaking and will undertake to protect California vineyards from a catastrophic pest outbreak.  As a result of APHIS's actions, the Commission has reallocated research resources to prioritize research on the European grapevine moth in preparation for an outbreak in California.  The Commission budgeted $134,684 to support invasive species research in 2024, and at least $29,279 of the 2024 budget is now focused on the

---

[124] *See Sierra Club v. EPA*, 755 F.3d 968 (D.C. Cir. 2014) (It is "a hardly speculative exercise" "to predict that [an entity] … would take advantage of the [regulatory change] for which they lobbied" such that "particularized fears of serious … environmental consequences" and the "behavioral changes" resulting from the regulatory change establish injury-in-fact).

[125] *Napa County Winegrape Pest & Disease Control District*, Cnty. of Napa, https://www.countyofnapa.org/1562/Winegrape-Pest-Disease-Control-District.

European grapevine moth, as the Commission supports work on five categories of testing and two reports relating to the European grapevine moth. Over two years, the Commission will have spent approximately $60,000 on this European grapevine moth research alone.

85.     The Commission has also been expending resources to monitor and report to stakeholders on changes in the import requirements, prepare protective measures to contain an outbreak, and ensure no loss to market access. The Commission conservatively estimates that approximately $132,000 of staff time has been diverted to preparation to mitigate the effects of the Grape Import Notice, and at least the same amount of staff resources will be required during the next shipping season. This reallocation pulls staff members away from their primary purpose of creating demand in the world marketplace for California table grapes, leading to lost opportunities in connection with the Commission's other alternatives.

86.     The Commission's budget for next year will need to include at least an additional $50,000 allocated to its early- and late-season promotional campaigns, which includes offering retailer incentives and active consumer outreach, to account for increased Chilean volume and Chilean entry into the organic market.

87.     *The costs and burdens incurred by Plaintiffs and the growers they represent will escalate quickly upon detection of a pest as a result of the relaxed requirements in the Grape Import Notice.* The introduction of a new pest resulting from the transition to the systems approach would threaten all sectors of the grape industry. In California alone, there were 125,000 acres of table grapes and 610,000 acres of wine grapes in 2023.[126] Thirteen states

---

[126] CDFA, *California Grape Acreage Report: 2023 Crop*, 2 (Apr. 30, 2024), https://www.nass.usda.gov/ Statistics_by_State/California/Publications/Specialty_and_Other_Releases/Grapes/Acreage/2024 /grpacDETAILED2023Crop.pdf.

produced 5,909,500 tons of grapes that year.[127]  The estimated value of the California table grape crop was over $2.3 billion in 2023.[128]  The U.S. wine industry generated over $276 billion in value for the U.S. economy and directly employed as many as 1,007,459 people in 2022.[129]

88.  At the peak of the European grapevine moth outbreak in California, 2,335 square miles (an area roughly the size of Delaware) was placed under quarantine.[130]  More than 60,000 traps were deployed in nearly 325,000 hectares of vineyards under quarantine.[131]  Traps were deployed in commercial vineyards and residential areas at densities of 39 and 10 traps per square kilometer, respectively.[132]  Fruit in the quarantine areas could not be moved without inspection and containment measures.[133]  In addition, extensive use of "insecticides, mating disruption, and fruit-stripping treatments" was required in treatment zones around each detection.[134]

89.  In 2016, APHIS issued a post-eradication workplan that quantified the high cost of monitoring and treating for the European grapevine moth.[135]  A single vineyard trap that

---

[127] USDA, Nat'l Agricultural Statistics Service, *Crop Production* 34 (Aug. 12, 2024), https://tinyurl.com/3hshaa76.

[128] California Table Grape Commission, 2023 Industry Data Sheet 3.

[129] WineAmerica, *United States Economic Impact Study 2022*, https://tinyurl.com/3pwufzff.

[130] Department of Agriculture and Weights and Measures, Napa Cnty., *Ag Commissioner/Sealer News, European Grapevine Moth Eradicated* 2 (Nov. 2016), https://www.countyofnapa.org/ArchiveCenter/ViewFile/Item/53.

[131] Tyler E. Schartel et al., *Reconstructing the European Grapevine Moth (Lepidoptera: Tortricidae), Invasion in California:  Insights From a Successful Eradication*, Annals of the Entomological Soc'y of Am. 1, 3 (2018).

[132] *Id*. at 5.

[133] *Id*. at 3.

[134] *Id*.

[135] European Grapevine Moth Post-Eradication Response Guidelines, *supra* n.16.

covers two flights cost $77.[136]  A vineyard trap covering three flights cost $96.  The estimated

cost to institute trap-based protective measures across the required acreage was $2.63 million for

two generations and $3.28 million for three generations.  A single urban trap costs $55 for a

period of 5 months.  APHIS estimated in 2016 that if a single European grapevine moth were

detected in Napa or Sonoma, the delimitation costs stemming from a single detection would be

$387,600.  It also estimated that treatment in response to a moth capture at a single vineyard

would cost the grower $110,000.

90.    The Commission is familiar with the financial burden inflicted by such crises and

expects to incur a similar burden in an infestation from Chile.  During the 2010-2011 fiscal year,

the Commission devoted $1,375,654 from funds collected by assessments on California table

grapes to issue management.  In connection with the European grapevine moth outbreak in

California, the Commission worked with the USDA, the California Department of Food and

Agriculture, the California Grape & Tree Fruit League, and county-level authorities to determine

how to contain the spread of the pest and then establish quarantine regulations that would allow

the growers and shippers within the quarantine zone to pick, pack, and ship their fruit and to ship

fruit for others.  The Commission also provided the data needed to prove to the regulators and

the international research panel that table grapes could be safely shipped without any need for

the harsh regime initially proposed.

91.    In response to the quarantine imposed because of the outbreak, the Commission

helped fund the trapping that was required in vineyards and co-funded a treatment coordinator,

---

[136] "Flights" measure the adult stage of European grapevine moths when the moths are most
mobile and mating occurs.  During the prior outbreak, European grapevine moths in California
exhibited three flights annually.  Report of the Technical Working Group for the European
Grapevine Moth Program 2 (Aug. 8, 2016), https://www.aphis.usda.gov/sites/default/files/twg-
report-8-8-16.pdf.

who worked with the EGVM Project Team (i.e., the joint USDA-CDFA regulatory staff overseeing the quarantine).  The Commission also funded an EGVM program coordinator to provide a liaison between growers and the three government agencies involved in overseeing trapping, inspection, fumigation, and shipment.  Throughout the process, the Commission and the California Table Grape Export Association also worked with the USDA to keep international markets open for the growers and shippers in the quarantine zone.[137]  The Commission would have to incur similar, if not greater, costs when a new pest enters the United States as a result of the systems approach.

92.     Members of the Alliance, which include growers in all grape sectors coast to coast, will also have to contend with the failings of the systems approach and the resulting economic, environmental, and phytosanitary risks.  The Alliance's mission is dedicated to ensuring a healthy and thriving U.S. grape and wine industry and maintaining the domestic industry's economic standing.  Specifically, the Alliance's objectives include ensuring the availability of healthy plant material for the U.S. grape and wine industry, safeguarding the sustainability of U.S. grape production, and ensuring the long-term economic resilience of the industry.  With members in all sectors of the grape industry throughout the United States, and Chilean grapes being imported through multiple states (including California, Florida, Georgia, Pennsylvania, and Washington), an Alliance member would be affected by the importation of pests no matter where in the United States the pests entered.  One or more Alliance members also

---

[137] The Commission has historically played a pivotal role in responding to unexpected pest discoveries.  For example, the domestic grape industry almost lost access to the entire U.K. market in November 2002, when a black widow spider was found in a shipment of California table grapes to the United Kingdom.  The Commission worked tirelessly, including on Thanksgiving Day, to reassure U.K. importers that California table grapes could be safely distributed in the United Kingdom.

produces organic table grapes, which will be harmed by increased domestic competition with newly certified organic Chilean grapes under a systems approach.

93. The eradication of the European grapevine moth from California was ultimately a successful (albeit costly) venture, but not all pest outbreaks can be undone.  In 2000, the USDA Secretary declared an emergency over the glassy-winged sharpshooter (*Homalodisca coagulata*).[138]  That pest spreads bacteria that cause Pierce's disease, which "interferes with the transport of water through" grapevines by clogging the water-conducting vessels.[139]  The costs associated with that emergency were substantial.[140]  Unfortunately, efforts to control the glassy-winged sharpshooter are ongoing.[141]

94. *The Commission will suffer direct economic harm as a result of market closures stemming from a pest outbreak*.  The Commission's work is funded by an assessment on California table grapes shipped during each marketing season.[142]  When the California table grape industry is affected by a development that causes crop losses or otherwise reduces shipments, it not only undercuts the Commission's statutory responsibility to promote the industry, but also directly reduces the resources available to the Commission to carry out its statutory mandates.  When vineyards and grape crops are damaged by a pest outbreak, fewer shipments of California table grapes occur, and the Commission takes a direct economic hit

---

[138] 65 Fed. Reg. 41,930 (July 7, 2000).

[139] *Id.*; *Pierce's Disease*, CDFA, https://www.cdfa.ca.gov/pdcp/Pierce's_Disease.html #:~:text=Pierce's%20disease%20in%20grapevines%20was,%2Dconducting%20vessels%20(xyl em).

[140] *See* Karen M. Jetter et al., *The Cost of the Glassy-Winged Sharpshooter to California Grape, Citrus and Nursery Producers*, 68 Cal. Agric., 161 (2014), https://tinyurl.com/272y5vpx.

[141] *See Pierce's Disease Control Program Maps*, CDFA, https://www.cdfa.ca.gov/pdcp/map_ index.html.

[142] Cal. Food & Agric. Code § 65600.

resulting from fewer assessments.  When foreign markets are closed to California grapes, the Commission similarly suffers direct economic harm resulting from fewer assessments.  For example, during the outbreak of the European grapevine moth in California, some foreign markets closed to U.S. table grapes.

95.     The Commission and growers suffer risk of economic loss stemming from market closures even if an invasive pest does not establish itself on California grapevines.  For example, in 2010, when the Spotted Wing Drosophila was discovered in California, Australia temporarily closed its market to California table grapes even though the Spotted Wing Drosophila was not discovered on grapes.  Shipments of California table grape to Australia only resumed subject to methyl bromide treatment and then later an alternative post-harvest treatment.  Similarly, interceptions of green stink bugs and scentless plant bugs on shipments of California table grapes in 2022 and 2023 led Australia to suspend shipments from affected grape growers until they comply with new procedures even though green stink bugs and scentless plant bugs are not themselves grape pests.

96.     *The systems approach creates competitive harm for domestic grape growers during the U.S. grape season.*  The competitive harm to Plaintiffs and to the grape growers represented by Plaintiffs provides an additional source of injury.  It is undisputed that removal of mandatory fumigation will improve the shelf-life of grapes that are exported from Chile.  For grapes to undergo fumigation with methyl bromide, the cold-storage chain must be broken during fumigation, and an unbroken cold-storage chain extends the shelf-life of the fruit and maintains its quality as compared with fruit for which the cold-storage chain is broken.  APHIS's unlawful decision to eliminate the fumigation requirement thus exposes Plaintiffs and the growers they represent to predictable, concrete economic injury through increased competition.

46

97.     While the shipping seasons for U.S. and Chilean table grapes are partially
complementary, the two seasons overlap at the end of the U.S. season in December and January
and at the beginning of the U.S. season in May and June.  Because the switch to a systems
approach allows the cold-storage chain to remain unbroken, Chilean grape growers are able to
extend their shipping season to exert further economic pressure on the U.S. market for a longer
period of time in early summer, well into the beginning of the U.S. season.  When the supply of
grapes in the United States increases, prices and sales decrease, directly affecting U.S. growers'
ability to compete, including growers represented by Plaintiffs.  This volume and price reduction
results in lower profits for grape growers and diminished assessments for the Commission.[143]

98.     *Domestic organic grape growers now face competition from organic Chilean
grapes for the first time.*  The move to the systems approach enables Chilean producers to
compete for the first time in the U.S. organic table grape market.  Chilean grapes fumigated with
methyl bromide cannot be certified organic.  As a result, the U.S. organic table grape industry
has never had to compete with organic Chilean grapes at any time, harming U.S. growers
represented by Plaintiffs in a market segment that commands a price premium.[144]  According to
the Chilean Undersecretary of International Economic Relations, "We are certain that this is an
opportunity for producers in the Atacama, Coquimbo and Valparaíso regions to boost their
competitiveness in the U.S. market and increase the quality of their products, improving their

---

[143] *Mendoza v. Perez*, 754 F.3d 1002, 1011 (D.C. Cir. 2014) ("The competitor standing doctrine
recognizes [that] 'parties suffer constitutional injury in fact when agencies lift regulatory
restrictions on their competitors or otherwise allow increased competition.'").

[144] 2024 Economic Effects Assessment at 2.

entry conditions and value to compete in markets that increasingly demand sustainability and adaptation to climate change."[145]

99.     *Plaintiffs have suffered procedural and informational injuries based on APHIS's refusal to publicly share the operational workplan and to provide Plaintiffs with an opportunity to comment on it.*[146]  Plaintiffs have also been injured by APHIS's failure to abide by notice-and-comment procedures in various critical respects.  Plaintiffs have been deprived of the ability to comment on and shape the operational workplan, the "binding document[]" that includes a "detailed description of the objectives, proposed activities, and expected results and benefits of the importation of a specific commodity and the related roles responsibilities, and resources contributed by each signatory."[147]  The 2024 CIED requires that Chile's national plant protection organization, SAG, work with APHIS to "develop an operational workplan that details the activities and responsibilities that SAG will carry out to meet the requirements of the systems approach."[148]  The Commission requested access to the operational workplan so that the public could meaningfully address critical aspects or highlight deficiencies of the proposed systems approach that were not yet made public.[149]  A failure of the systems approach would require Plaintiffs to implement measures to prevent any pest outbreak in their grapes.  Plaintiffs are thus entitled to a comprehensive understanding of the systems approach and its shortfalls, both to meaningfully engage with APHIS on the risks and rulemaking, and to mitigate any risks to them.

---

[145] Minesterio de Agricultura, *Chile and the US Agree to Launch the Systems Approach for Chilean Table Grapes* (June 26, 2024), https://tinyurl.com/5n6cnzwm (text and title translated from Spanish).

[146] *See Friends of Animals v. Jewell*, 824 F.3d 1033, 1040 (D.C. Cir. 2016).

[147] 83 Fed. Reg. at 46,631.

[148] 2024 CIED at 4.

[149] CTGC Comments at 20-21.

Yet the Grape Import Notice went into effect before Plaintiffs had access to or opportunity to comment on the workplan.

## COUNT ONE
### (APA, 5 U.S.C. § 706(2)(D))

### PROMULGATING A LEGISLATIVE RULE WITHOUT FOLLOWING NOTICE-AND-COMMENT RULEMAKING PROCEDURES

100.    Plaintiffs reallege all preceding paragraphs of this complaint as if fully set forth herein.

101.    APHIS's decision to abandon mandatory fumigation in favor of a new systems approach for multiple entities across various regions in Chile is a legislative (or substantive) rule.[150]  It was therefore required to go through notice-and-comment rulemaking.

102.    APHIS promulgated the Grape Import Notice as a legislative rule without observance of the procedures outlined in 5 U.S.C. § 553.  APHIS has not claimed that it published only an interpretative rule, a statement of policy, or guidance.  Nor has APHIS claimed good cause to forgo rulemaking procedures or published the reasons for good cause alongside the Grape Import Notice.

103.    Despite APHIS's characterizations, the shift from mandatory methyl bromide fumigation to permitting a systems approach is, in all respects, a legislative rule.  The Grape Import Notice involves APHIS prospectively changing the binding, generally applicable rules that govern the import of a product (table grapes) from large regions of Chile (regardless of the Chilean grower) into the United States.  Hallmarks of legislative rules include their general applicability and their focus on future effect, both of which are readily present here.

---

[150] *See* 5 U.S.C. § 551(4) (defining "rule" as the "whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy").

104.    APHIS's description of the process as an "informal adjudication" does not save the lawfulness of the Grape Import Notice.  Substance, not labels, matter.  Here, APHIS's labelling as "informal adjudication" a process through which the agency makes binding changes in legal requirements applicable to all eligible entities in Chile that seek to import table grapes into the United States stretches that concept beyond its breaking point.  It is blackletter law that an agency cannot announce what is in essence a legislative rule but label it an adjudication to sidestep rulemaking requirements, even when an agency believes it would be more efficient to avoid rulemaking obligations under the APA.

105.    APHIS's failure to follow rulemaking requirements was not harmless.  Because APHIS issued the 2022 Proposed Notice only after it had already determined—without soliciting comment, much less considering stakeholder input—that methyl bromide fumigation was no longer necessary,[151] the adoption of the systems approach was foreordained.  The 2022 Proposed Notice thus reflects "the culmination … rather than the initiation, of the decisionmaking process,"[152] rendering the comment period after APHIS made its determination insufficient.

106.    In addition, APHIS failed to provide a meaningful opportunity for notice and comment because it declined to provide necessary documents and information to allow commenters to meaningfully engage with APHIS's abandonment of fumigation.  For example, APHIS failed to disclose the information it relied upon in issuing the Grape Import Notice, including the operational workplan and underlying studies, even after multiple commenters emphasized the need to review such information to be able to meaningfully comment.  The operational workplan that APHIS developed in secret with Chile's national plant protection

---

[151] 7 C.F.R. § 319.56-4(c).

[152] *Safari Club Int'l v. Zinke*, 878 F.3d 316, 335 (D.C. Cir. 2017).

organization explains crucial details of how the systems approach for Chilean table grapes will be carried out on the ground.  The operational workplan is, as APHIS has explained, a "binding document[]" that "includes a detailed description of the objectives, proposed activities, and expected results and benefits of the importation of a specific commodity."[153]

107.    Because it is a binding document that contains the specific steps necessary to meet the requirements of the systems approach, the operational workplan must be disclosed, and the public must have a meaningful opportunity to comment on it, as required by the APA.

108.    In addition, APHIS bypassed the APA's 30-day waiting period between the publication of the final rule and the effective date by putting the Grape Import Notice into effect immediately.  5 U.S.C. § 553(d).  APHIS also bypassed OMB and OIRA review under Executive Order 12,866.  And it sidestepped its obligation to consider the rule's economic impact on small entities in a regulatory flexibility analysis, as required by the Regulatory Flexibility Act.[154]  APHIS had considered an analysis under the Regulatory Flexibility Act necessary when it proposed a systems approach for Chilean table grapes in 2008.[155]  But in the Grape Import Notice, APHIS did not even publish the required certification, alongside its factual basis, for why it would not undertake a regulatory flexibility analysis.

109.    Regardless of the bureaucratic efficiencies APHIS believes its notice-based regime may provide, before making binding changes effected by the Grape Import Notice, APHIS was required to go through notice-and-comment rulemaking.  Because APHIS failed to follow those procedures, the Grape Import Notice should be vacated and set aside.

---

[153] 83 Fed. Reg. at 46,631.

[154] 5 U.S.C. § 601-12; *see also* Grape Import Notice at 58,712 (APHIS contending that "such notices" are not "subject to the Regulatory Flexibility Act").

[155] 73 Fed. Reg. 50,577, 50,579-80 (Aug. 27, 2008).

## COUNT TWO
## (APA, 5 U.S.C. § 706(2)(A))

## DECISIONMAKING THAT IS "ARBITRARY, CAPRICIOUS, AN ABUSE OF DISCRETION, OR OTHERWISE NOT IN ACCORDANCE WITH LAW"

110.     Plaintiffs reallege all preceding paragraphs of this complaint as if fully set forth herein.

111.     For numerous reasons, the Grape Import Notice is not the product of reasoned decisionmaking and is arbitrary and capricious.  The APA requires a reviewing court to "hold unlawful and set aside agency action … found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"—requirements that apply regardless of whether agency action is an informal adjudication or a substantive rule.[156]  An action is arbitrary or capricious if, among other things, the agency fails to consider a relevant factor or an important aspect of the issue under consideration.[157]  That standard of reasoned decisionmaking ought to be particularly demanding under the Plant Protection Act, because Congress mandated that APHIS use processes based "on sound science" and that are "transparent and accessible."[158]

112.     To begin with, APHIS did not proceed in a "transparent" or "accessible" manner in issuing what is in effect a legislative rule without releasing any version of the operational workplan, which informs significant aspects of the rule's implementation, for comment.  In addition, APHIS's adoption of the rule through various procedural shortcuts (as outlined in Count I, above) also violates both the PPA and the APA's mandate against arbitrary or capricious action.

---

[156] 5 U.S.C. § 706(2)(A).

[157] *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983).

[158] 7 U.S.C. § 7712(b).

113.     APHIS also violated its core obligation of reasoned decisionmaking in multiple ways.  Among other things, APHIS failed to take a hard look at the salient problems, including the prevalence of pests in Chile, by discounting or ignoring the cumulative risk of pests, the impact of pests in a different environment where Chile's native natural enemies may be absent, the risk of unknown pests, and the risk of accidents or gamesmanship by Chilean producers implementing the systems approach.  Nor did APHIS take a hard look at the limitations and prior failings of the systems approach.  APHIS further failed to explain why, when compared to its 2009 PRA, it downgraded pests considered high- and medium-risk while removing some pests from the risk assessment entirely.  APHIS also did not engage in reasoned decisionmaking when it failed to adequately explain why it was changing a regime that had worked effectively for decades, relying on outdated data, and limiting its role to assessing only the proposal in Chile's request, while disclaiming the obligation to meaningfully consider reasonable alternatives to methyl bromide fumigation or substantive modifications to Chile's proposal.  APHIS also failed to identify any advantage of shifting to a systems approach that would justify the increased uncertainty and risk created by abandoning a long-proven, effective approach to addressing the serious risk from Chilean pests.  An unstated desire to reduce the use of methyl bromide for vague environmental reasons is not sufficient, particularly considering that those reasons are not relevant to the efficacy of pest management.  In addition, APHIS acted irrationally in putting the cart before the horse by issuing the Grape Import Notice and approving Chile's capacity to implement the systems approach, without knowing the standards and details for the systems approach being finalized in closed-door negotiations with Chile's national plant protection organization.  APHIS also acted arbitrarily in failing to respond adequately to significant

concerns raised by stakeholders in response to the 2022 Proposed Notice, including those by Plaintiffs.

114.   APHIS has wrongly disclaimed, several times, the need for or propriety of sound economic analysis when considering changes to import requirements.[159]  In the Grape Import Notice, APHIS simply assumes that the systems approach mitigates pest risk when calculating the economic consequences of that approach.[160]  Yet crucial domestic economic costs will flow from a systems approach that permits pest outbreaks, at least as compared with the current treatment of methyl bromide fumigation.[161]  APHIS's failure to consider such a critical component of the cost-benefit analysis leaves the Grape Import Notice and the 2024 Economic Effects Assessment fatally flawed, and elevates the interests of Chilean producers over the domestic interests APHIS was charged to protect.  Reasoned decisionmaking required APHIS to address such important aspects of the issues before it, including the advantages and disadvantages of its change in import requirements.

115.   For these reasons and others, including those reflected in the administrative record, APHIS's decision to move to a systems approach was neither based on "sound science" nor "transparent and accessible," rendering it arbitrary and capricious, unsupported by substantial evidence, and not the product of reasoned decisionmaking.  The Grape Import Notice should be vacated and set aside.

---

[159] 83 Fed. Reg. at 46,629 (explaining that "notices published using the notice-based method will not contain economic analyses"); *id.* at 46,633 (stating that APHIS determinations are based "on the findings of the pest risk analysis, not on economic factors").

[160] Grape Import Notice at 58,712.

[161] *Supra* ¶¶ 40-47 (discussing the proposed systems approach in 2008, the contemporaneous discovery of the European grapevine moth in Chile, and the 2010 outbreak of the moth in California).

## COUNT THREE
## (APA, 5 U.S.C. § 706(2)(A), (D))

**FAILURE TO DISCLOSE CRITICAL INFORMATION FOR PUBLIC COMMENT,
AND PREVENTING A MEANINGFUL OPPORTUNITY TO COMMENT**

116.    Plaintiffs reallege all preceding paragraphs of this complaint as if fully set forth herein.

117.    APHIS's failure to disclose key information necessary for a proper opportunity to comment, including the operational workplan and the studies underlying APHIS's adoption of the systems approach, violated the agency's duty under the APA to permit meaningful comment on critical information the agency has relied on in deciding to relax requirements for the importation of fruit from a pest-infested region.

118.    The operational workplan forms a critical part of APHIS's analysis of the systems approach.  But without disclosing the details of the operational workplan for comment before it issued the Grape Import Notice, APHIS could not fully evaluate whether the systems approach will adequately mitigate risk posed by the importation of Chilean grapes into the United States. Likewise, the studies underlying the Grape Import Notice and the 2024 CIED played a crucial role in APHIS determining that a systems approach could supposedly mitigate risk to an acceptable level.

119.    APHIS has failed to provide an opportunity for the public to give meaningful and written comments on critical information.  APHIS failed to provide that opportunity despite specific requests for an additional comment period.  Because APHIS's failure to disclose critical information violated its obligations under the APA, the Grape Import Notice should be vacated and set aside.

## COUNT FOUR
## (NEPA, 42 U.S.C. § 4332; APA, 5 U.S.C. § 706(2)(A), (D))

**FAILURE TO COMPLY WITH THE NATIONAL ENVIRONMENTAL POLICY ACT**

120.     Plaintiffs reallege all preceding paragraphs of this complaint as if fully set forth herein.

121.     Section 102 of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332, and NEPA's implementing regulations, 40 C.F.R. §§ 1500.1 *et seq.*, require federal agencies to: (1) prepare and solicit comments on an environmental impact statement for all major federal actions significantly affecting the human environment or (2) prepare an environmental assessment if the proposed action is neither categorically excluded from the requirement to produce an environmental impact statement nor would clearly require the production of an environmental impact statement.

122.     Introducing known or unknown pests on grapes from Chile into the United States would have serious consequences for the human environment.  APHIS did not, however, prepare an environmental impact statement or an environmental assessment regarding the adoption of a systems approach.

123.     APHIS's failure to prepare an environmental impact statement or environmental assessment violated NEPA and the implementing regulations, and the agency thereby acted without observance of procedure required by law or otherwise not in accordance with the law. Given this violation of NEPA and the APA, the Grape Import Notice should be vacated and set aside.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court grant the following relief:

1.   Declare that the Grape Import Notice violates the APA because it is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, 5 U.S.C. § 706(2)(A), and was not adopted with observance of procedure required by law, *id.* § 706(2)(D);

2.   Declare that the Grape Import Notice violates the Plant Protection Act's requirement to use "processes … in developing regulations … governing consideration of import requests" that are "based on sound science" and are "transparent and accessible," 7 U.S.C. § 7712(b);

3.   Issue an order holding unlawful, vacating, and setting aside the Grape Import Notice and enjoining Defendants from implementing the Grape Import Notice or otherwise allowing the importation of grapes from Chile under a systems approach;

4.   Award Plaintiffs their costs and reasonable attorney fees associated with this litigation under 28 U.S.C. § 2412, as appropriate; and

5.   Grant such other relief as the Court deems necessary, just, and proper.

Dated:  September 13, 2024

Respectfully submitted,

*/s/ Kelly P. Dunbar*
KELLY P. DUNBAR (DC Bar No. 500038)
THOMAS G. SAUNDERS (DC Bar No. 503012)
DONNA M. FARAG (DC Bar No. 90006157)
GARY M. FOX* (DC Bar No. 1708711)
GILBERT G. ORBEA* (DC Bar No. 90017559)

WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Ave. NW
Washington, DC  20037
(202) 663-6000

*Counsel for Plaintiffs*

* *Application for admission to D.D.C. bar pending*