UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CALIFORNIA TABLE GRAPE
COMMISSION, *et al.*,

    *Plaintiffs*,

v.

UNITED STATES DEPARTMENT OF
AGRICULTURE, *et al.*,

    *Defendants*.

Civil Action No. 24-02645 (AHA)

### Memorandum Opinion

The plaintiffs are three entities invested in the health and commercial success of table grapes grown in the United States. They challenge a decision by the Department of Agriculture's Animal and Plant Health Inspection Service ("APHIS") to switch to a new system for mitigating the risk of a pest outbreak caused by imported Chilean table grapes. The parties each move for summary judgment. For the reasons below, the Court finds that the agency's action was arbitrary and capricious under the Administrative Procedure Act ("APA"). The Court accordingly grants the plaintiffs' motion for summary judgment and denies the defendants' cross motion.

**I.  Background**

Congress passed the Plant Protection Act in 2000, after finding that "the detection, control, eradication, suppression, prevention, or retardation of the spread of plant pests or noxious weeds is necessary for the protection of the agriculture, environment, and economy of the United States." 7 U.S.C. § 7701(1). That act authorizes the Secretary of Agriculture to "prohibit or restrict the importation, entry, exportation, or movement" of plants or plant products if "the prohibition or

restriction is necessary to prevent the introduction into the United States or the dissemination of a plant pest . . . within the United States." *Id.* § 7712(a). The Secretary has delegated this authority to APHIS. 7 C.F.R. §§ 2.22(a)(2)(xxxi), 2.80(a)(36).

Almost six decades ago, the Department of Agriculture and APHIS exercised their authority under the act to require that all table grapes—that is, fresh grapes grown for direct human consumption, rather than grapes processed into other products like wine—from Chile be fumigated before distribution in the United States. Administrative Record ("AR") 24908, 33129. Until recently, Chilean table grapes had to be fumigated with methyl bromide, which is effective at killing a wide variety of pests, including the Chilean false red mite and European grapevine moth. AR 24908, 31305, 33227–28.[1]

For years, Chile has urged APHIS to relax the fumigation requirement. In 2008, based on a request from Chile's national agriculture agency, APHIS published a proposed rule that would have allowed Chilean table grapes to be imported into the United States using a different, "systems" approach. AR 4, 24919. A systems approach requires a "set of phytosanitary conditions, at least two of which have an independent effect in mitigating the pest risk associated with the movement of commodities." AR 24918. Instead of mandating fumigation, the systems approach mitigates pests through the collective effect of multiple overlapping precautionary measures. AR 32797. APHIS's proposed rulemaking was premised on the conclusion that the systems approach would be sufficient to protect against the Chilean false red mite. AR 24917–19. While APHIS was considering the new rule, however, Chile suffered an outbreak of European grapevine moths, which cause significant damage to grapes and can lead to extensive crop loss. AR 4, 66, 32989.

---

[1] APHIS relaxed the methyl bromide fumigation requirement for some period of time but returned to it in 1996 due to frequent pest interceptions. *See* AR 4, 33129.

APHIS accordingly abandoned its proposed rule and continued to require methyl bromide fumigation for Chilean table grapes. AR 4.

Chile's agriculture agency continued to advocate for a relaxation of the methyl bromide fumigation requirement and, in 2022, APHIS published a proposed notice to replace the fumigation requirement with a systems approach for certain regions of Chile. AR 1. Along with the proposed notice, APHIS published its risk assessment and evaluation of a systems approach to mitigating risk. AR 113–209, 24893–906. APHIS's proposed notice and underlying assessments and evaluations considered only whether to adopt a systems approach because that was the only method requested by Chile. AR 1–2; ECF No. 23 at 7. After receiving comments on the proposed notice, APHIS published a final notice adopting the systems approach for certain regions in Chile, as an alternative option to methyl bromide fumigation. AR 4–5; Importation of Grapes from Chile into the United States, 89 Fed. Reg. 58703 (July 19, 2024).

Three entities invested in the health and commercial success of table grapes grown in the United States filed this suit to challenge the final notice. The California Table Grape Commission is a public agency created by the State of California to increase demand for Californian table grapes. ECF No. 19-4 ¶¶ 5–6. The California Table Grape Export Association was created by the Commission to facilitate the export of Californian table grapes. *Id.* ¶¶ 63–64. The National Grape Research Alliance is a nonprofit membership organization made up of grape growers and other entities from grape-growing regions of the United States, dedicated to facilitating research to advance the interests of the U.S. grape industry. ECF No. 19-5 ¶¶ 2–3. The plaintiffs challenge the final notice under the APA and the National Environmental Policy Act. The plaintiffs and the defendants each move for summary judgment. ECF Nos. 19, 23.

**II.     Discussion**

The APA authorizes judicial review of final agency action and requires a court to "hold unlawful and set aside agency action" found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §§ 702, 704, 706(2)(A). If agency action is found to be unlawful, the "normal remedy" is to vacate the rule. *Ky. Mun. Energy Agency v. FERC*, 45 F.4th 162, 179 (D.C. Cir. 2022). Here, it is undisputed that APHIS's final notice was a final agency action within the meaning of the APA. *See* ECF No. 23 at 13. The plaintiffs argue that action violates the APA for three reasons. First, they say it amounts to a legislative rule that failed to comply with the APA's requirement to provide notice and an opportunity to comment. *See* 5 U.S.C. § 553. Second, they argue the final notice was arbitrary and capricious. Third, they argue the final notice violates the National Environmental Policy Act.

Before getting to those arguments, the Court begins with the question of whether the plaintiffs have standing to bring this challenge to the final notice in the first place.

**A.  At Least One Plaintiff Has Standing To Challenge APHIS's Final Notice**

"To establish Article III standing, the plaintiff must have 'suffered an injury in fact' that 'is fairly traceable to the challenged action of the defendant' and it must be 'likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *Banner Health v. Price*, 867 F.3d 1323, 1333–34 (D.C. Cir. 2017) (quoting *Friends of the Earth v. Laidlaw Env't Servs.*, 528 U.S. 167, 180–81 (2000)). And because this case is at the summary judgment stage, the plaintiffs "may not rest on 'mere allegations, but must set forth by affidavit or other evidence specific facts' demonstrating standing." *Shays v. FEC*, 414 F.3d 76, 84 (D.C. Cir. 2005) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). "It is settled that in a case involving joined, individual plaintiffs bringing a shared claim seeking a single remedy, Article III's case-or-controversy requirement is satisfied if one plaintiff can establish injury and standing."

*J.D. v. Azar*, 925 F.3d 1291, 1323 (D.C. Cir. 2019). Here, the plaintiffs argue they have standing on three different bases: as competitors in the relevant market, from the risk of future injury from pest outbreaks, and based on procedural injury. The Court starts with the first basis and, because it concludes the plaintiffs have competitor standing, it need not reach whether they would have standing based on the risk of a pest outbreak that affects domestic grapevines or procedural injury.

"The competitor standing doctrine recognizes 'parties suffer constitutional injury in fact when agencies lift regulatory restrictions on their competitors or otherwise allow increased competition.'" *Mendoza v. Perez*, 754 F.3d 1002, 1011 (D.C. Cir. 2014) (quoting *La. Energy & Power Auth. v. FERC*, 141 F.3d 364, 367 (D.C. Cir. 1998)). "Because increased competition almost surely injures a seller in one form or another," sellers do not have to wait until they are actually harmed by competition "before challenging the regulatory (or, for that matter, the deregulatory) governmental decision that increases competition." *Sherley v. Sebelius*, 610 F.3d 69, 72 (D.C. Cir. 2010).

The Commission and Alliance have shown they have competitive interests in the U.S. table grape market. Although the Commission does not sell table grapes, it is funded by assessments on the amount of Californian table grapes sold, so its injury mirrors that of a direct competitor. ECF No. 19-4 ¶ 9. And because ninety-nine percent of domestic table grape production is in California, direct competition with Californian table grapes is all but guaranteed. *Id.* ¶ 19. The Alliance can assert the competitive injury to its members because it has associational standing to do so. *See Save Jobs USA v. DHS*, 942 F.3d 504, 508 (D.C. Cir. 2019) (analyzing the requirements for associational standing in the context of a plaintiff organization representing members with competitive injuries). At least some Alliance members "would otherwise have standing to sue in their own right" because they will be forced to manage the increased competition—for example,

5

the Alliance represents growers of organic table grapes. *See Flyers Rts. Educ. Fund, Inc. v. U.S. Dep't of Transp.*, 957 F.3d 1359, 1361 (D.C. Cir. 2020); ECF No. 19-5 ¶ 8. The members' interests are "germane to the organization's purpose" because the Alliance's goal is to leverage research ultimately to "maximize [the] productivity, sustainability, and competitiveness" of the American grape industry, including the table grape industry. *See Flyers Rts.*, 957 F.3d at 1361; ECF No. 19-5 ¶ 3. Finally, "neither the claim asserted nor the relief requested requires the participation of individual" Alliance members. *See Flyers Rts.*, 957 F.3d at 1361.

And it is clear the final notice has a concrete impact on competition within the U.S. table grape market. As described, the notice lifts longstanding restrictions on producers across several regions of Chile, allowing their grapes to enter the U.S. market in new ways—namely, without methyl bromide fumigation. The record indicates, and APHIS acknowledges, the growing seasons for Chilean and American table grapes overlap. AR 12; ECF No. 23 at 17. And the final notice impacts the competitive posture of the plaintiffs in at least two ways. First, according to the record, allowing table grapes to enter the U.S. market without methyl bromide fumigation means Chilean growers can compete more effectively with American growers because table grapes that have not been fumigated are higher quality and stay fresh longer. AR 24812, 32344; ECF No. 19-5 ¶ 8. Second, the unfumigated Chilean grapes are newly eligible for organic certification, so American sellers of organic table grapes will have to compete in the market against Chilean sellers of organic table grapes for the first time. *Id.* Indeed, the record indicates that the first shipments of organic Chilean table grapes have already arrived in the United States. ECF No. 26-1 ¶ 3.

The Commission and Alliance accordingly have standing to challenge the final notice as competitors. The Court need not address whether they separately have standing to sue based on

6

the risk of injury from pest outbreaks or procedural injury, nor whether the Export Association independently has standing.

### B. The Final Notice Is Arbitrary And Capricious

As mentioned above, the plaintiffs argue the final notice violated the APA because it was a legislative rule, not an adjudication, issued without full notice-and-comment procedures; was arbitrary and capricious; and was contrary to the National Environmental Policy Act (under which they also appear to assert a standalone claim). The Court agrees the final notice is arbitrary and capricious, although it does not adopt all of the reasons the plaintiffs offer, and vacates the notice on that basis. The Court accordingly need not determine whether APHIS's import notice procedures violate the APA or if the final notice is otherwise contrary to law.

The Court's review of whether agency action is arbitrary and capricious is a narrow one, and not an invitation "to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). A court's role is to "confirm that the agency has fulfilled its duty to examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Ark Initiative v. Tidwell*, 816 F.3d 119, 127 (D.C. Cir. 2016) (quotation marks omitted) (quoting *State Farm*, 463 U.S. at 43). "[A]n agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* (alteration in original) (quoting *State Farm*, 463 U.S. at 43). The requirement of reasoned decisionmaking applies to both rulemakings and adjudicative agency action. *See Fox v. Clinton*, 684 F.3d 67, 75 (D.C. Cir. 2012) (explaining that the requirement of reasoned decisionmaking "indisputably applies" to agency adjudications); *Spirit Airlines, Inc. v.*

7

*U.S. Dep't of Transp. & Fed. Aviation Admin.*, 997 F.3d 1247, 1255 (D.C. Cir. 2021). "[T]he party challenging an agency's action as arbitrary and capricious bears the burden of proof." *Pierce v. SEC*, 786 F.3d 1027, 1035 (D.C. Cir. 2015) (alteration in original) (quoting *San Luis Obispo Mothers for Peace v. NRC*, 789 F.2d 26, 37 (D.C. Cir. 1986) (en banc)).

The Court agrees with the plaintiffs that the final notice is arbitrary and capricious because APHIS limited its consideration to only the systems approach requested by Chile rather than also considering other responsible alternatives, did not adequately consider the impact of eliminating the methyl bromide fumigation mandate on domestic growers, and did not disclose key materials.

*1. APHIS Failed To Consider Any Alternatives Beyond The Systems Approach That Chile Requested*

The plaintiffs argue the final notice is arbitrary and capricious because APHIS refused to consider any alternatives to methyl bromide fumigation other than a systems approach. The plaintiffs point to a comment proposing fumigants other than methyl bromide as an alternative. *See* AR 33228–31 (proposing other fumigants, including ethyl formate, phosphine, and ozone, which may be used in combination with one another or with other options such as sulfur dioxide or cold treatment). According to that comment and other materials in the record, some of the alternative fumigants had already been approved for other commodities, would have been equally effective and, insofar as APHIS had concerns about the environmental impact of methyl bromide fumigation, would have had less environmental impact. AR 33228–31, 31461.

The APA requires an agency "to consider responsible alternatives to its chosen policy and to give a reasoned explanation for its rejection of such alternatives." *Spirit Airlines*, 997 F.3d at 1255 (quoting *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 242 (D.C. Cir. 2008)). The D.C. Circuit has advised that this principle "goes to the heart of reasoned decisionmaking" and "is not limited to rulemaking." *Id.* When presented with "facially reasonable alternatives," an agency

8

"must *either* consider those alternatives *or* give some reason, within its broad discretion . . . for declining to do so." *Laclede Gas Co. v. FERC*, 873 F.2d 1494, 1498 (D.C. Cir. 1989). Here, APHIS acknowledges that it did not consider any alternative to methyl bromide fumigation except for a systems approach. AR 5–6; ECF No. 23 at 26. It accordingly failed to consider "facially reasonable alternatives" to its chosen policy. *Laclede Gas*, 873 F.2d at 1498.

According to APHIS, it had no obligation to consider anything but a systems approach because that is the only alternative Chile asked for. AR 5–6; ECF No. 23 at 26. APHIS describes its regulatory process, explaining that it was initiated by a request from Chile's national agriculture agency and that, although the process involved collecting comments from others, its regulations "do not involve *sua sponte* risk analyses of options" beyond the one proposed by Chile. ECF No. 23 at 25. In other words, according to APHIS, its only obligation was to give a thumbs up or down to the alternative that Chile proposed, no matter how many reasonable—or even better—alternatives may exist to mitigate pest risks in accordance with the agency's statutory directive. That is a dubious understanding of the agency's mandate. Indeed, even in this particular case APHIS determined that it could and should make some changes to Chile's proposal—for example, APHIS did not limit itself to the regions or eligibility requirements that Chile proposed, taking liberties to change both. AR 24910, 24914, 32406, 32413, 32415. Even accepting APHIS's interpretation of the agency's regulatory process, the APA requires reasoned decisionmaking, including considering reasonable alternatives.

### 2. *The Agency Failed To Adequately Consider Domestic Reliance Interests*

The plaintiffs also argue the final notice is arbitrary and capricious because it was issued without consideration of important domestic reliance interests—namely, those of domestic growers whose businesses and own risk assessments of pest outbreaks had operated under the

9

longstanding rule mandating methyl bromide fumigation before Chilean grapes could enter the U.S. market. This point is also well taken.

"When an agency changes course," it must "be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (citation omitted); *see FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (describing this requirement in the context of a policy change made via adjudication). It is undisputed that the decades-long agency policy—and therefore the decades-long expectation of domestic table grape producers in assessing risks to their own businesses and grapevines—had been that Chilean grapes entering the United States would be subject to mandatory methyl bromide fumigation. The plaintiffs point to record evidence, which the agency does not appear to dispute, indicating that methyl bromide fumigation is especially effective at preventing certain known pests. AR 31305, 33226–28. The agency determined that the systems approach provided adequate protection, but it does not dispute that methyl bromide fumigation is even more comprehensive. The plaintiffs attest that without this additional assurance against pest outbreak, they will have to take measures to protect their domestic growing businesses from the increased risk of infestation. *See* ECF No. 19-4 ¶ 11. It is "arbitrary [and] capricious to ignore such matters." *Fox Television*, 556 U.S. at 515.

The agency offers two responses, but neither justifies its failure to even consider these domestic reliance interests. First, APHIS says "detailed consideration of reliance interests was not required because the Final Notice was not a change in longstanding regime requiring such consideration." ECF No. 30 at 23. This is so, the agency says, because Chilean growers still have the option of using methyl bromide fumigation; the final notice simply "permitted the additional option of a systems approach for grapes in certain geographic regions of Chile." ECF No. 23 at

10

40. That is not a sound response. As noted, the prior policy, in place for decades, mandated methyl bromide fumigation. The very change adopted and challenged is to relax that requirement and allow Chilean producers to import grapes without methyl bromide fumigation, using an approach that is not as comprehensive in protecting against outbreak. *See* AR 5 (describing methyl bromide fumigation as a potential "remedial measure" if pests are detected in systems-approach grapes at a U.S. port of entry).

Second, the agency says it was not required to consider the reliance interests of domestic growers as they relate to the possibility of a pest outbreak because the agency had determined that relaxing the fumigation requirement would still "reasonably mitigate the risk of pests associated with Chilean table grapes." *Id.* But that is not a reason for entirely failing to consider the pest-outbreak-related reliance interests of, and corresponding costs to, domestic growers. That the agency concluded the risk of pests would be adequately mitigated by changing the longstanding fumigation mandate to the systems approach does not mean that domestic growers would not have to modify their processes to protect against added risk—as the plaintiffs say they will have to do. ECF No. 19-4 ¶ 11. Indeed, the agency itself has implicitly recognized that methyl bromide fumigation is more dependable by making methyl bromide fumigation a failsafe when other eligibility requirements are not met. AR 24888, 24910–11, 32835. The plaintiffs also point to APHIS's own data indicating that the cost to institute protective measures is significant. ECF No. 19-1 at 41. To be sure, it may well be the case that the agency would determine the efficacy of the systems approach outweighs or, in the agency's view, even obviates the need for domestic growers to adjust their business to take additional precautions. But it is the agency—"not its counsel and

not this Court"—that needs to bring "its expertise and its best judgment to bear upon that issue." *Chamber of Com. of U.S. v. SEC*, 412 F.3d 133, 145 (D.C. Cir. 2005). Here, it did not do so.[2]

### 3. The Agency Should Have Disclosed The Studies It Relied On

The plaintiffs argue that the agency acted arbitrarily and capriciously by relying on outdated studies about the effectiveness of a systems approach to mitigating the Chilean false red mite without explaining why it was appropriate to do so and then elected to publish summaries of the studies instead of releasing the underlying data to the public. The Court agrees in part.

The Court does not agree that the agency relied on the studies in an arbitrary and capricious way. APHIS explained that these studies tested the effectiveness of the systems approach in areas with low prevalence of the mites. AR 10, 24913. Contrary to the plaintiffs' characterization, the agency did not rely on the studies to establish that mites are currently low prevalence. *Id.* The agency provided a reasoned explanation for why it could rely on these studies years later: the studies were not "dependent on the conditions of any particular growing season" because they evaluated whether the systems approach would work in Chilean regions that then, just as now, were certified as low prevalence for the Chilean false red mite. AR 10.

But even if APHIS provided a rational explanation of the study, "[a]n agency's denial of a fair opportunity to comment on a key study may fatally taint the agency's decisional process."

---

[2] In addition to disclaiming an obligation to consider reliance interests and denying that domestic growers had reliance interests related to pest outbreak risk management that are impacted by the policy change, the agency says it did engage in some "consideration of the interests of domestic industry" by analyzing the economic impact of the final notice. ECF No. 30 at 23. APHIS explained why it believed Chilean table grape exports would not increase by much and then went on to consider the impact of an "unlikely" influx of imported Chilean table grapes. AR 12. APHIS concluded that even if that caused tens of millions of dollars in losses for domestic growers, American consumers would benefit. *Id.* The Court does not find any "serious flaw" undermining the agency's analysis of those competitive reliance interests. *Idaho Conservation League v. Wheeler*, 930 F.3d 494, 507 (D.C. Cir. 2019) (citation omitted). However, the agency did not adequately consider reliance interests related to pest outbreak risk management.

*Nat'l Ass'n of Regul. Util. Comm'rs v. FCC*, 737 F.2d 1095, 1121 (D.C. Cir. 1984). Disclosure of key studies "allows the parties to focus on the information relied on by the agency and to point out where that information is erroneous or where the agency may be drawing improper conclusions from it." *Id.* Here, APHIS confirms that these were key studies because they provided the "only available data" on the subject. ECF No. 23 at 30 n.6; *see* AR 10. APHIS does not dispute that it "summarized" but did not disclose the data. AR 10; *see* ECF No. 23 at 31. Without the actual data, it is impossible to say whether the agency's summary is accurate or whether it may be "drawing improper conclusions" from the studies. *Nat'l Ass'n of Regul. Util. Comm'rs*, 737 F.2d at 1121. This conceded refusal to disclose therefore "taint[s] the agency's decisional process." *Id.*

  4. *The Plaintiffs' Remaining Challenges To The Agency's Reasoning Are Less Persuasive*

Although the Court concludes the final notice was arbitrary and capricious for the reasons above, it does not adopt several other arguments that the plaintiffs advance.

First, the plaintiffs argue that the agency acted arbitrarily and capriciously by failing to consider and provide drafts of its "operational workplan" when it proposed its initial notice. ECF No. 19-1 at 30–31. An operational workplan is an agreement between APHIS and a foreign government that details how the mitigation measures for a specific commodity will work in practice and spells out the roles, resources, and responsibilities assigned to and contributed by the agency and its foreign counterpart. AR 5, 32936–37. Here, APHIS says it finalized the operational workplan after it issued the final notice, and it did not rely on drafts of the workplan while it was weighing the decision to switch to a systems approach. ECF No. 23 at 28; AR 5. Contrary to the plaintiffs' argument, it was not arbitrary and capricious for the agency to adopt a systems approach and specify operational details later. Although the plaintiffs identify particular details in the operational workplan—such as the technical mechanics of trapping protocols for the European grapevine moth, sampling rates, the approach for segregating systems-approach table grapes from

13

other grapes, and "details of activities to be conducted in the packinghouse"—they do not explain why finalizing these details could not reasonably be left for an operational workplan. *See* ECF No. 26 at 29.

Second, the plaintiffs say the agency did not sufficiently reckon with past failures of the systems approach, thereby ignoring one troubling aspect of the problem. However, APHIS met its obligation to provide a reasoned explanation by explaining that it did not attribute these purported failures to the systems approach and they accordingly did not counsel against adopting a systems approach. For example, the plaintiffs say the agency backtracked from relaxing the mandatory methyl bromide fumigation requirement in the 1990s after frequent pest interceptions, but the agency did not say it switched to a systems approach at that time, so any purported failure therefore cannot be ascribed to the systems approach. AR 4, 33129. The plaintiffs point out that the agency did consider a systems approach in 2008 until a European grapevine moth outbreak in Chile, but the agency's final notice reasoned that it did not backtrack because of a deficiency in the systems approach; rather, the analysis of the systems approach that had been conducted simply had not yet accounted for the European grapevine moth. AR 4. Here, in contrast, the agency specifically considered whether the systems approach could reasonably mitigate the risk of the European grapevine moth. *Id.* Finally, the plaintiffs note that as recently as 2021, systems-approach Chilean plums were found to contain European grapevine moth larvae. ECF No. 26 at 35. But the agency explains that the systems approach for plums at the time of detection did not include mitigation measures for the European grapevine moth, unlike the systems approach adopted in the final notice. AR 9. The agency accordingly did not ignore the fact that larvae were detected in Chilean plums when it decided to adopt the systems approach for Chilean grapes; instead, it distinguished

14

the situations on a meaningful basis and explained "why it should expect different results this time around." ECF No. 19-1 at 36.

Third, the plaintiffs contend that the agency acted arbitrarily and capriciously because it did not consider the cumulative risk posed by multiple kinds of pest. However, the agency explained why it believed the concept of cumulative risk is inapplicable to this context. AR 6. It also explained how it conducts its pest risk assessments: it uses the methodology developed by the International Plant Protection Convention, which is an intergovernmental treaty intended to protect the world's plants and other natural resources from pest outbreaks. AR 116; International Plant Protection Convention, U.N. Food and Agriculture Organization, Dec. 6, 1951. Although the plaintiffs may prefer a different methodology, apparently inspired by Environmental Protection Agency risk assessments, the agency did not have to adopt it. *See* ECF No. 19-1 at 37. The agency has not offered the "conclusory and unsupported postulations in defense" of its preferred approach that would render its decision arbitrary and capricious. *Pro. Pilots Fed'n v. FAA*, 118 F.3d 758, 771 (D.C. Cir. 1997) (Wald, J., concurring in part).

Fourth, the plaintiffs say that the agency concluded physical barriers would help prevent the risk of U.S. infestation while ignoring that grape packing and shipping facilities are in fact located very close to domestic grape vineyards. But the agency reasoned that the systems approach would mitigate the risk of pests entering the United States to begin with. AR 6, 116. And it reasoned that imported systems-approach grapes are subject to mandatory inspection at the port of entry. AR 13. According to the agency, those precautionary measures taken before and when the grapes first arrive in the United States adequately reduce the risk pests will make it past the port of entry to the packing and shipping facilities; the agency's reasoning therefore does not turn on

the distance to domestic vineyards. AR 8. It is not accurate to say the agency ignored this proximity problem; under the agency's reasoning, proximity is not a problem in the first place.

Fifth, the plaintiffs say that the agency failed to consider the risk that Chile would have accidents or engage in gamesmanship. But the agency considered both possibilities. As to the first, the agency explained that "the systems approach consists of multiple independent but interlocking measures that mitigate pest risk; if one measure fails, other measures . . . remain." AR 8. As to the second, the agency noted that it would respond to gamesmanship by potentially prohibiting the importation of any systems-approach grapes until appropriate "corrective action" is taken. *Id.* Rather than ignore these two potential pitfalls, the agency explained how it would account for both. The plaintiffs may be dissatisfied with APHIS's position on each, but they have not shown that APHIS overlooked or dismissed these issues in a manner that could be deemed arbitrary and capricious.

Sixth, the plaintiffs assert that APHIS ignored the risks posed by unknown pests when it adopted the systems approach. Here again, the agency did address this aspect of the problem by explaining that the new systems approach would mitigate not just the known pests that were the focus of the agency when evaluating the new approach, but also low-risk pests more generally. *Id.* The agency recognized the possibility an unknown pest could emerge and existing measures would not be sufficient, in which case the agency would take additional emergency measures in response. *Id.* The agency therefore understood the possibility that a previously unknown pest could create new and unaccounted-for risks and made a reasoned choice for how to deal with that possibility.

### III.   Conclusion

For these reasons, the plaintiffs' motion for summary judgment, ECF No. 19, is granted. The defendants' cross motion for summary judgment, ECF No. 23, is denied. The final notice,

Importation of Grapes from Chile into the United States, 89 Fed. Reg. 58703 (July 19, 2024), is vacated.

    A separate order accompanies this memorandum opinion.

                                                                                    _____

                                                                      AMIR H. ALI
                                                                       United States District Judge

Date:   September 30, 2025